UNIVERSIDAD DE PUERTO RICO, demandante y recurrente, *v.* ASOCIACIÓN PUERTORRIQUEÑA DE PROFESORES UNIVERSITARIOS, demandada y recurrida.

*Número:* JR-91-103 *Resuelto:* 13 de junio de 1994

336

*Miguel Palou Sabater* y *Jorge Calero Blanco*, abogados de la parte recurrente; *Jorge E. Carrera Rovira*, abogado de la Asociación Puertorriqueña de Profesores Universitarios, parte recurrida; *María Susana Márquez Canals*, abogada de la Junta de Relaciones del Trabajo de Puerto Rico.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

Nos toca decidir si los miembros de la facultad de la Universidad de Puerto Rico son empleados, conforme las normas jurídicas del país sobre las relaciones obrero-patronales, y si, como tales, tienen derecho a organizarse y negociar colectivamente.

I

El 28 de mayo de 1987 la Asociación Puertorriqueña de Profesores Universitarios (en adelante la Asociación) presentó una petición para la investigación y certificación de un representante ante la Junta de Relaciones del Trabajo de Puerto Rico (en adelante la Junta). Luego de celebrar unas audiencias públicas durante marzo, abril y mayo de 1988 ante un oficial examinador, y sometidos los memorandos de derecho de las partes, la Junta emitió un "Proyecto de decisión y orden de elecciones" el 31 de enero de 1990. Las partes presentaron sus excepciones al proyecto para marzo y el 23 de enero de 1991 la Junta emitió su decreto final.

En su decreto, la Junta determinó, en esencia: (1) que la Universidad de Puerto Rico (en adelante U.P.R.) es un "patrono" de acuerdo con la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 61 *et seq.*; (2) que los profesores del Recinto de Río Piedras, salvo por algunas excepcio-

nes,(¹) son empleados con derecho a unionarse y no son "empleados gerenciales", y (3) que el Recinto de Río Piedras constituye por sí solo "una unidad apropiada para la negociación colectiva".(²) De acuerdo con sus determinaciones, la Junta ordenó que se celebrara una elección entre los profesores de la U.P.R., Recinto de Río Piedras, para determinar si deseaban estar representados por la Asociación.

La U.P.R. recurrió oportunamente a nosotros en solicitud de revisión y alegó, en síntesis: (1) que la Junta carece de jurisdicción sobre la U.P.R. por ésta no ser un patrono para propósitos de la Ley de Relaciones del Trabajo de Puerto Rico; (2) que los profesores de la U.P.R. son "empleados gerenciales" a tenor con la doctrina de *NLRB v. Yeshiva University*, 444 U.S. 672 (1980), y como tales, no tienen derecho a organizarse y a negociar colectivamente; (3) que la negociación colectiva con el personal docente crearía una situación de conflicto de intereses en la U.P.R., y (4) que, en todo caso, la unidad apropiada es el sistema universitario en su totalidad, no el Recinto de Río Piedras por sí solo.

El 5 de marzo de 1991 la Junta se opuso a que expidiéramos el auto de revisión. Alegó que este Tribunal no tenía jurisdicción para entender en este asunto, por no haberse celebrado aún un procedimiento de práctica ilícita de tra-

---

(¹) En específico, la Junta de Relaciones del Trabajo de Puerto Rico (en adelante la Junta) ordenó que los empleados con derecho a participar en la elección eran "todos los profesores, bibliotecarios e investigadores permanentes, temporeros, probatorios y sustitutos, a tarea completa, que ejercen funciones en el Recinto Universitario de Río Piedras; excluídos [sic] los miembros del Consejo de Educación Superior del Sistema Universitario; el Presidente; los Miembros de la Junta Universitaria, de las *Juntas Administrativas*; el Rector; los Decanos y los Jefes o Directores de Departamentos, los miembros de los *Comités de Personal*, los empleados no docentes; supervisores; ejecutivos; administradores; empleados confidenciales, *o íntimamente ligados a la gerencia*; y, cualesquiera otras personas con autoridad para emplear, ascender, disciplinar, despedir o hacer recomendaciones al efecto, o de alguna manera variar el status de los profesores ...". (Énfasis suplido.) *Universidad de Puerto Rico*, Dec. de la J.R.T. Núm. 1171, pág. 44 (1991).

(²) La "unidad apropiada para la negociación colectiva" es aquella que designe la Junta como el total de empleados que tendrán derecho a designar una unión como representante exclusivo para fines de la negociación colectiva.

bajo contra la U.P.R. No obstante, entendimos que teníamos jurisdicción, y el 21 de marzo de 1991 expedimos el auto para revisar la decisión de la Junta y, en auxilio de jurisdicción y a petición de la U.P.R., ordenamos paralizar los procedimientos de representación pendientes ante la Junta, particularmente la elección ordenada.(³)

Elevados los autos y sometidos los alegatos, tanto de las partes como de la Junta, procedemos a resolver.

## II

Como ya hemos indicado, antes de que expidiéramos el auto de revisión la Junta compareció en oposición por entender que este Tribunal no tenía jurisdicción para entender en esta controversia bajo la Ley de Relaciones del Trabajo de Puerto Rico. Específicamente, alegó que:

> La Ley 130 de Relaciones del Trabajo de Puerto Rico, 29 LPRA 61 y ss., según enmendada, en su Artículo 9(2)(a) dispone para la revisión de Decisiones y Ordenes finales en casos de prácticas ilícitas de trabajo. También, claramente establece que las Decisiones y Ordenes en casos de representación —a diferencia de los casos de prácticas ilícitas del trabajo— sólo son revisables mediante ataque colateral subsiguiente a una Decisión y Orden por práctica ilícita del trabajo.

En apoyo de esta interpretación, la Junta citó varios casos provenientes de la jurisprudencia federal.

Luego de nuestra resolución, mediante la cual asumimos jurisdicción, paralizamos todos los procedimientos ante la Junta y expedimos el auto de revisión; *ni la Junta ni la Asociación levantaron o discutieron la cuestión jurisdiccional en sus respectivos alegatos.* Lo anterior, no obs-

---

(³) Al ser considerado el Recurso de revisión de 21 de marzo de 1991 en el Pleno, este Tribunal decidió revisar la decisión y orden de elecciones dictada por la Junta y decretó la paralización de los procedimientos pendientes ante ella. Todos los Jueces que intervinieron estuvieron conformes, excepto el Juez Asociado Señor Negrón García, quien hubiese denegado el recurso por falta de jurisdicción. El Juez Asociado Señor Rebollo López no intervino.

tante, en vista de que dicha cuestión es privilegiada, pasamos a considerarla de inmediato.

■ A. En reiteradas ocasiones hemos reconocido que la Junta tiene jurisdicción exclusiva para determinar, en primera instancia, la composición de una unidad apropiada para fines de negociación colectiva. No cabe duda de que la injerencia judicial sobre tal determinación es sólo a nivel de revisión. Véanse: *J.R.T. v. A.M.A.*, 119 D.P.R. 94, 99 (1987); *F.S.E. v. J.R.T.*, 111 D.P.R. 505, 514 (1981); *Rivera v. Junta de Relaciones del Trabajo*, 70 D.P.R. 5, 12–13 (1949). La referida norma, sin embargo, no determina la cuestión jurisdiccional que tenemos ante nos ahora. Dicha norma alude a una limitación que atañe únicamente al alcance de la jurisdicción de los tribunales de instancia, y *en nada afecta la autoridad de este Tribunal para decidir en revisión cuestiones de derecho en materia de relaciones obrero-patronales.* Véanse: *Pérez Maldonado v. J.R.T.*, 132 D.P.R. 972 (1993); *J.R.T. v. Marex Construction Co., Inc.*, 103 D.P.R. 135, 140 (1974); *Junta Rel. Trabajo v. Junta del Muelle*, 71 D.P.R. 154, 157–158 (1950). *Ello es particularmente cierto en casos como éste, en que los derechos afectados tienen rango constitucional y cuya dilucidación nos corresponde exclusivamente.* Véanse: *Silva v. Hernández Agosto*, 118 D.P.R. 45, 55–58 (1986); *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576, 591 (1983); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750, 759–760 (1977).

Por otro lado, en relación con el planteamiento de la Junta, tenemos que el Art. 5(3) de la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945 (29 L.P.R.A. sec. 66), dispone que:

(3) ... Las conclusiones de la Junta, el procedimiento electoral, la resolución de la controversia relativa a la representación, la determinación de la unidad y el certificado del resultado de cualquier elección así llevada a cabo, serán finales y estarán sujetos a *revisión judicial* sólo de la manera que se dispone en el inciso (4) de esta sección. (Énfasis suplido.)

A su vez, dicho inciso (4) del Art. 5 dispone que:

(4) Siempre que una orden de la Junta dictada de acuerdo con la sec. 70 de este título se base, en todo o en parte, en hechos certificados después de una investigación o audiencia pública efectuada de acuerdo con el inciso (3) de esta sección, y exista una petición para que se ponga en vigor dicha orden y para que se revise, la certificación y el expediente de la investigación o audiencia efectuada de acuerdo con el inciso (3) de esta sección se incluirán en la transcripción del expediente completo que ha de presentarse de acuerdo con la sec. 70 de este título y entonces el decreto del tribunal, poniendo en vigor, modificando o anulando en todo o en parte la orden de la Junta, se hará y se expedirá a base de los autos, el testimonio y los procedimientos expuestos en dicha transcripción. 29 L.P.R.A. sec. 66(4).

Por otro lado, el Art. 9 de la Ley Núm. 130, *supra*, en su inciso (2) dispone, en parte, sobre el procedimiento de práctica ilícita que:

(b) Cualquier persona perjudicada por una orden final de la Junta concediendo o negando, en todo o en parte, el remedio que se interesa, podrá obtener la revisión de dicha orden en el Tribunal Supremo de Puerto Rico, radicando en dicho tribunal una petición escrita suplicando que la orden de la Junta sea modificada o revocada. 29 L.P.R.A. sec. 70(2)(b).

Estas disposiciones enrevesadas de nuestra ley jamás han sido objeto de un análisis particular o a fondo por este Tribunal. Nunca hemos tenido ante nos el planteamiento concreto que formuló la Junta inicialmente en este caso. Nunca hemos resuelto que nuestra facultad de revisión judicial, en casos como el de marras, sólo puede ejercitarse por la vía colateral. En sólo dos ocasiones previas hemos hecho alguna referencia de pasada al asunto, de manera puramente incidental, y en ambos casos con relación a controversias totalmente distintas de la que nos ocupa hoy. Veamos.

En *Junta Relaciones del Trabajo v. Ortega*, 79 D.P.R. 760, 765 esc. 5 (1956), dijimos —*estrictamente de pasada y en una nota al calce*— que "[u]na resolución de la Junta en

un procedimiento de representación no es revisable". En dicho caso el Tribunal Superior había dictado una resolución que obligaba a un patrono a dar cumplimiento a una orden de la Junta que le citaba a comparecer a un procedimiento de representación. El patrono planteaba que la Junta local carecía de jurisdicción para entender en el caso ante la negativa de la Junta Nacional a asumir jurisdicción sobre la misma petición, argumento que levantó por primera vez ante el tribunal de instancia. Nosotros confirmamos la resolución dictada en instancia y resolvimos que dicha cuestión debió ser planteada por el patrono ante la Junta bajo el principio de que toda parte agraviada debe agotar los remedios administrativos disponibles antes de tener acceso a los tribunales. *Junta Relaciones del Trabajo v. Ortega*, supra, pág. 765.

Años más tarde, en *Luce & Co. v. Junta Relaciones del Trabajo*, 82 D.P.R. 96 (1961), hicimos referencia a las aludidas disposiciones de nuestra ley y señalamos que el citado Art. 9(2)(b), que autoriza la revisión judicial de órdenes finales de la Junta, equivale a la Sec. 10 de la Ley Nacional de Relaciones del Trabajo de 1935, conocida como "Ley Wagner" (*Taft–Hartley*), 29 U.S.C. sec. 151. En *Luce & Co. v. Junta Relaciones del Trabajo*, supra, también señalamos que la referida disposición *federal* había sido objeto de frecuente interpretación y, *en resumen, aludimos a sus principales interpretaciones federales.* Como parte de ese trasfondo normativo que allí reseñamos, de nuevo y *de pasada*, señalamos que *en el ámbito federal* se había resuelto que:

... no constituyen órdenes finales sujetas a revisión *a*) una resolución sobre certificación para la determinación de representantes a los fines de negociación colectiva, ... a menos que se haya dictado una orden final en un procedimiento para la prevención de prácticas ilícitas basada en hechos certificados en un procedimiento de representación, como la negativa a negociar con una unión certificada .... *Luce & Co. v. Junta Relaciones del Trabajo*, supra, págs. 98–99.

No obstante, la controversia propiamente ante este Tribunal en *Luce & Co. v. Junta Relaciones del Trabajo*, supra, era si una resolución de la Junta, que desestimaba una solicitud para que se instaran cargos por práctica ilícita de trabajo, podía ser considerada como una "orden final" para los efectos del Art. 9 de la Ley Núm. 130, *supra*. Resolvimos que no lo era y desestimamos el recurso de revisión presentado.

Como puede observarse, pues, no hay nada en *nuestros propios precedentes* que impida que asumamos jurisdicción en el caso ahora ante nos. Nuestra jurisprudencia no apoya el reclamo de la Junta.

Por otro lado, también hemos examinado la jurisprudencia federal que interpreta las disposiciones de ley de las cuales provienen las nuestras, por el valor altamente persuasivo e ilustrativo que, de ordinario, tienen en nuestras decisiones en materia laboral.

■ En la jurisdicción federal impera el mecanismo mediante el cual, de ordinario, se puede obtener la revisión judicial de una decisión de la Junta federal dimanante del procedimiento de representación únicamente por la vía colateral, al dilucidarse judicialmente un procedimiento de práctica ilícita de trabajo. Este esquema de revisión judicial fue establecido en el ámbito federal para evitar que los patronos pudiesen acudir ante los tribunales a solicitar la revisión judicial de una orden de la Junta como medio para dilatar el procedimiento de elecciones. El esquema federal persigue el fin de fortalecer la posición de los trabajadores durante el proceso de negociación con el patrono. *Boire v. Greyhound Corp.*, 376 U.S. 473 (1964); *A.F. of L. v. Labor Board*, 308 U.S. 401 (1940). Para su historial legislativo, véase S. Rep. No. 573, 74th Cong., 1 Sess. 14 (1935); H. R. Rep. No. 972, 74th Cong., 1 Sess. 5 (1935).

El esquema federal referido persigue propósitos que compartimos *y debemos acogerlo en nuestra jurisdicción en todo lo posible, sobre todo en vista de que nuestra Ley de*

*Relaciones del Trabajo tuvo a la federal como modelo.* Dejamos claramente establecido, pues —como no lo habíamos hecho nunca antes— *que de ordinario* la revisión judicial de una orden de la Junta, *en casos corrientes de representación*, procede únicamente por la vía colateral, como parte de una determinación de la Junta sobre práctica ilícita de trabajo. Protegemos así los legítimos intereses del trabajador en Puerto Rico.

Lo anterior, no obstante, no nos priva de jurisdicción aquí, como alega la Junta. Por sus circunstancias especiales, no es de aplicación *al caso ante nos* la aludida limitación a la revisión judicial, en casos ordinarios de representación.

Como puede observarse, el referido mecanismo de revisión por la vía colateral va dirigido a limitar, no la jurisdicción de los tribunales de instancia en casos de representación (jurisdicción primaria), sino la de *revisión judicial* de las decisiones de la Junta, lo que nos atañe particularmente. Desde hace mucho tiempo hemos establecido que nuestra autoridad para decidir *cuestiones de derecho* en materia de relaciones obrero-patronales no está restringida por las facultades cuasi judiciales que tiene la Junta. Así lo determinamos en *Junta Rel. Trabajo v. Junta del Muelle*, supra, pág. 158, en el cual resolvimos que la cuestión de si una agencia del Gobierno puede ser considerada "patrono" para efectos de la ley no era una cuestión de hecho con la cual no debíamos intervenir en ausencia de abuso de discreción de la Junta, sino que era una cuestión estrictamente de derecho *que este Tribunal tenía el deber de resolver de manera final mediante el ejercicio de nuestro criterio independiente sobre ésta.* En ese caso, la Junta había alegado que su dictamen, de que determinada agencia gubernamental era "patrono", era concluyente y que no podíamos intervenir con ella, a tenor con lo dispuesto en el Art. 9(2)(b) de la Ley Núm. 130, *supra.* Rechazamos allí dicha pretensión de la Junta y afirmamos nuestra autori-

dad para decidir las cuestiones de derecho. Reconocimos con claridad que resolver de otra manera *sería otorgarle a la Junta el poder de decidir por su cuenta el significado de la ley y de determinar su propia jurisdicción. Junta Rel. Trabajo v. Junta del Muelle*, supra, pág. 157.

 Nuestra facultad para determinar cuestiones de derecho es particularmente clara e irrestricta en aquellos casos especiales en los cuales están o pueden estar presentes cuestiones jurídicas de *índole constitucional.* En Puerto Rico, a diferencia de la jurisdicción federal, los derechos de organización y negociación colectiva tienen rango constitucional. *J.R.T. v. Asoc. C. Playa Azul I*, 117 D.P.R. 20, 33 (1986). Por lo tanto, pueden suscitarse controversias, previo al procedimiento de práctica ilícita de trabajo, que requieran la atención oportuna a planteamientos de índole constitucional. En esas ocasiones la parte afectada por una orden de la Junta, incluso por órdenes de elecciones o de certificación de unidad apropiada, tiene derecho, al amparo de nuestra Constitución, a un remedio adicional al provisto en la ley. En estos casos, es función ineludible de este Tribunal impartir la interpretación definitiva de las cuestiones constitucionales. Véanse: *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716 (1982); *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978). Dicha función es *exclusiva de este Foro y no puede ser delegada a las otras ramas del Gobierno*, ni siquiera a las agencias especializadas como la Junta. *Pérez Maldonado v. J.R.T.*, supra; *Santa Aponte v. Ferré Aguayo*, 105 D.P.R. 670 (1977); *J.R.T. v. Marex Construction Co., Inc.*, supra.

El caso ante nos ahora es un ejemplo claro de la referida situación, en la cual la controversia involucra una cuestión constitucional. En su primer señalamiento de error la U.P.R. alega que la Junta no tenía facultad para dictar la orden de elecciones recurrida porque la U.P.R. no es un "patrono" para efectos de la Constitución y de la Ley de

Relaciones del Trabajo de Puerto Rico y que, por lo tanto, está fuera del alcance de la jurisdicción de la Junta. *Este planteamiento no requiere que evaluemos los méritos en sí de la determinación de la Junta sobre la composición de la unidad apropiada como tal.* Lo que se cuestiona propiamente es la autoridad de la Junta para asumir jurisdicción sobre la U.P.R. Si bien es cierto que esta cuestión surge dentro del proceso de certificación de unidad apropiada y debe ser resuelta en primera instancia por la Junta, la controversia gira propiamente en torno a si la U.P.R. está incluida o no dentro de las cláusulas aplicables de la Constitución y a la Ley de Relaciones del Trabajo de Puerto Rico. Tal es el asunto medular y no la cuestión de qué porción de los profesores de la U.P.R., si alguna, constituiría una unidad apropiada para la negociación colectiva.

En ocasiones anteriores nos habíamos visto obligados a revisar directamente una decisión y orden de elecciones de la Junta, *previo a un procedimiento de práctica ilícita,* para hacer valer los derechos consagrados en las Secs. 17 y 18 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, y en la Ley de Relaciones del Trabajo de Puerto Rico, y determinar si ciertas instituciones pueden ser consideradas o no como "patronos" para efectos de la negociación colectiva en nuestro ordenamiento jurídico.. En *J.R.M. v. J.R.T.,* 108 D.P.R. 448 (1979), a petición de la Junta de Retiro para Maestros, revisamos directamente una decisión y orden de elecciones de la Junta y revocamos la orden de la Junta por entender que ésta había actuado sin facultad debido a que la Junta de Retiro para Maestros no era un "patrono" para fines de la negociación colectiva. Posteriormente, en otro caso, con respecto a una solicitud de certificación de unidad apropiada presentada por la Unión Asociación de Empleados Profesionales y Clericales de la Autoridad de Carreteras, asumimos jurisdicción en dos ocasiones, previo a que se iniciara un procedimiento de

práctica ilícita, para revisar unas órdenes de la Junta.[4] *Reiteradamente, pues, este Tribunal ha tenido que revisar decisiones dictadas por la Junta en la etapa de representación y certificación de unidad apropiada para impartir la decisión final sobre cuestiones de la jurisdicción de la Junta y determinar si procede o no que se prosiga con el procedimiento establecido en la Ley de Relaciones del Trabajo de Puerto Rico.*[5]

B. Existen, además, otras razones que explican por qué es erróneo, *en el caso ante nos*, el planteamiento de falta de jurisdicción.

■ En su segundo señalamiento de error, la U.P.R. plantea una cuestión novel e importante sobre la aplicación de la norma del "empleado gerencial" al contexto universitario en relación con los derechos constitucionales de organización y negociación colectiva. Como es sabido, en asuntos de gran trascendencia al interés público es norma establecida de este Tribunal tomar en consideración la presencia de cuestiones noveles en nuestra jurisprudencia como uno de los criterios básicos para determinar si expe-

---

[4] Mediante Sentencia de 10 de diciembre de 1981, al revisar una orden de la Junta desestimatoria de la petición de la unión, devolvimos el caso a la Junta para que hiciera determinaciones sobre el funcionamiento de la Autoridad de Carreteras, a la luz de los criterios que señalamos en nuestra opinión de *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976), y determinara si la Autoridad funcionaba o no como una empresa privada. Posteriormente, mediante Sentencia de 23 de junio de 1987 (sentencia y opinión concurrente de la Juez Asociada Señora Naveira de Rodón, publicada en *Unión Empleados Carreteras v. J.R.T.*, 119 D.P.R. 116 (1987)), revocamos una resolución de la Junta que declaró sin lugar la solicitud de la Unión por falta de jurisdicción y nuevamente devolvimos el caso a la Junta para que resolviera la petición.

[5] Por otro lado, en *J.R.T. v. A.M.A.*, 119 D.P.R. 94 (1987), al atender una petición de la Junta para que pusiéramos en vigor una decisión y orden suya sobre clarificación de unidad apropiada dentro de un procedimiento de práctica ilícita, cuestionamos la actitud de la A.M.A. de "cruzarse de brazos" al no impugnar ni intentar revisar dicha orden de la Junta, previo al procedimiento de práctica ilícita. Ante unos planteamientos constitucionales de la A.M.A. relativos al debido procedimiento de ley, que resultaron ser altamente especulativos, intimamos que la falta de diligencia de la A.M.A. —al no impugnar la legalidad y corrección de la orden antes de que la Junta iniciara el procedimiento de práctica ilícita— atentaba contra la política pública de resolver prontamente las controversias obrero-patronales. Íd., págs. 99–101.

dimos el auto de revisión solicitado o no.(⁶) Esto es así porque una de las funciones primordiales de este Tribunal es precisamente interpretar el Derecho para pautar las que habrán de ser las normas aplicables a casos posteriores. Esta función es mucho más apremiante cuando se ven afectados derechos constitucionales de gran interés público.

Por otro lado, la cuestión de si los profesores de la U.P.R. son o no "empleados gerenciales" a los fines de la negociación colectiva, además de justificar nuestra intervención por tratarse de una cuestión jurídica novel, debe ser dilucidada final y definitivamente *previo a que se ponga en vigor la orden de elecciones recurrida.* Ello es así porque, como discutiremos más adelante, la normativa del "empleado gerencial" es precisamente determinativa del derecho invocado por los recurridos de que se les certifique como una unidad apropiada y se proceda a la negociación colectiva. Bajo ningún esquema razonable de revisión judicial se puede justificar la posposición de nuestra determinación sobre si los recurridos poseen el derecho a la negociación colectiva o no hasta después que se haya completado el complejo procedimiento de elección e iniciado la negociación colectiva. Estaríamos resolviendo si les cobijan determinados derechos *después* de haberlos disfrutado parcialmente. Ello es muy dispendioso y sólo serviría para crear falsas expectativas y hasta confusión sobre el asunto.

En el caso de marras, la U.P.R. alega que la resolución de esta controversia a su favor dispondría en su totalidad del caso porque la unidad propuesta por la Junta está compuesta *exclusivamente* de "empleados gerenciales". De te-

---

(⁶) La Regla 19a de nuestro Reglamento, 4 L.P.R.A Ap. I–A, dispone que, entre los criterios que tomaremos en consideración al determinar si expedimos un auto de cualquier género, se encuentran:

"(2) Si la cuestión planteada es novel.

"(3) Aun de no ser novel, si es importante para el interés público la expresión de la norma."

ner razón la U.P.R., la Junta no tendría facultad para dictar una orden de elecciones en relación con una unidad apropiada compuesta por profesores, puesto que *ninguno* de los componentes de la unidad propuesta tendría el derecho a organizarse. Este no es el caso en que el patrono impugna *una porción* de los empleados en la unidad apropiada. En casos en los cuales la unidad propuesta por la Junta contiene una porción significativa de empleados, que en efecto tienen derecho a unionarse, podría existir una justificación para aplicar la interpretación federal de las disposiciones aludidas y fomentar así una negociación más equitativa y pacífica, libre de tácticas dilatorias por parte del patrono. Sin embargo, en casos como éste, en el cual el peticionario alega que la unidad propuesta está compuesta *en su totalidad* de "empleados gerenciales" sin derecho a unionarse, la controversia gira propiamente sobre la facultad de la Junta y no sobre la composición de la unidad apropiada como tal. De ésta ser resuelta a favor del peticionario, dispondría del caso de manera final. En esta situación, la aplicación del esquema federal obligaría a las partes a acudir ante nos por el camino tortuoso y dispendioso de revisión de un procedimiento de práctica ilícita, sin que ello abone de modo alguno al resultado final del caso.[7]

Nótese que postergar la revisión judicial en un caso como el de autos, hasta que se determine por la Junta que hubo práctica ilícita, le requiere a las partes someterse a

---

[7] Cabe señalar que esta situación es verdaderamente excepcional al caso de marras porque resulta improbable que en casos ordinarios un patrono tenga fundamentos para impugnar el derecho a unionarse de la *totalidad* de los componentes de una unidad apropiada. Como explicaremos más adelante, el alcance de la normativa del "empleado gerencial" es mayor en el ámbito universitario de lo que es en el contexto industrial tradicional en el cual, de ordinario, solamente un grupo pequeño de empleados tiene funciones que pueden ser consideradas como "alineadas con la gerencia". En esos casos, las decisiones de la Junta relativas a la composición de la unidad apropiada comúnmente son del tipo de materia que se considera especializada por estar fundada mayormente en las determinaciones de hecho que formula la Junta respecto a las diferentes categorías de empleados dentro de una compañía y que son mayormente revisadas judicialmente dentro del procedimiento de práctica ilícita de trabajo.

un largo y costoso proceso que además es altamente adversativo. Luego que la Junta determine la composición de la unidad apropiada para la negociación colectiva y ordene que se celebren elecciones entre los componentes de dicha unidad bajo la dirección de un oficial examinador de la Junta, las partes están obligadas a dedicar recursos y esfuerzos para celebrar dichas elecciones. Con frecuencia, éstas son intensamente competitivas y provocan desasosiego y hasta seria inestabilidad en el lugar de trabajo. Ciertamente, ello sería así en un lugar como el Recinto de Río Piedras. Una vez celebradas las elecciones sindicales, si la Unión peticionaria obtiene la mayoría de los votos, es certificada por la Junta como representante exclusivo de dicha unidad apropiada para la negociación. Luego, el representante sindical le solicita al patrono negociar. Si éste no acepta, por entender que no procede en derecho o por cualquier otro motivo, la Unión puede presentar entonces ante la Junta un cargo de práctica ilícita contra el patrono. La Junta, entonces, decide si expedirá una querella o no. Si lo hace, el patrono debe contestar la querella, indicando sus razones para negarse a negociar. Sometida la respuesta del patrono, un oficial examinador prepara un informe y, posteriormente, la Junta emite su decisión. La Junta, entonces, puede dictar una orden para obligar al patrono a negociar y a entrar en un convenio, o cualquier otra orden que la Junta estime necesaria. Si el patrono no está conforme con la determinación de la Junta y no acata dicha orden, la Junta puede entonces acudir al Tribunal Superior y solicitar que ésta se ponga en vigor.

Al presentar la Junta su solicitud, se hace formar parte del expediente todo lo relativo al procedimiento de representación y certificación del representante sindical. Al revisar la orden de la Junta que obliga al patrono a negociar, es cuando el patrono ordinariamente tiene, por vez primera, la oportunidad de cuestionar las determinaciones de derecho formuladas por la Junta en el procedimiento de

representación. De no prevalecer el patrono, luego de que el tribunal de instancia confirma la orden de la Junta, es entonces que podría acudirse ante nos para revisar la decisión inicial de la Junta sobre la composición de la unidad apropiada.

Como puede observarse, en un caso como el de marras no se justifica seguir este largo, complejo, costoso y conflictivo proceso. Nada se ganaría que favorezca el interés público debido a que el asunto realmente en controversia puede adjudicarse desde que la Junta decida que existe una unidad apropiada.

Además, debemos tener en mente que la razón por la cual se creó este tortuoso procedimiento en la jurisdicción federal fue fundamentalmente para evitar que los patronos utilizaran la revisión judicial como táctica dilatoria para eludir la negociación. En este caso no existe evidencia alguna de que la U.P.R. haya solicitado nuestra intervención como una táctica dilatoria sino, por el contrario, existe evidencia de que lo hizo porque razonablemente entendió que existían circunstancias especiales que ameritaban que expidiéramos el auto y evitáramos un choque, quizás innecesario, entre la administración de la U.P.R. y los profesores.

C. Finalmente, debemos señalar que aun en la jurisdicción federal se han reconocido limitadas excepciones al esquema aludido en casos en que han existido circunstancias especiales, no consideradas en la ley federal. *Boire v. Greyhound Corp.*, *supra*.

■ 1. En *Leedom v. Kyne*, 358 U.S. 184 (1958), el Tribunal Supremo federal resolvió que el tribunal de distrito había actuado correctamente al revisar y revocar una orden de elecciones dictada por la Junta nacional, *previo al procedimiento de práctica ilícita*, porque al dictar la orden recurrida la Junta había actuado en exceso de sus poderes. El acto ilegal de la Junta en *Leedom v. Kyne*, supra, consistió en incluir, en una misma unidad apropiada, "empleados profesionales" con "empleados no-profesionales" sin

consultar a los primeros como lo requería la ley. El Tribunal Supremo federal resolvió que dicha actuación de la Junta nacional le había causado daños irreparables a los empleados profesionales. En apoyo de su decisión, el Tribunal Supremo federal explicó que el tribunal de distrito tenía facultad para entender en dicha acción en jurisdicción original bajo la Sec. 24(8) del Código Judicial, 28 U.S.C. sec. 133, y que las disposiciones respecto a su jurisdicción apelativa bajo la Ley Wagner *no tenían el efecto de eliminar, de su jurisdicción original, todas las acciones que involucrasen la revisión de un proceso de certificación de unidad apropiada previo al procedimiento de práctica ilícita de trabajo*, sino exclusivamente aquellas previstas en la ley. *Leedom v. Kyne*, supra, págs. 187–188. El Tribunal federal resolvió que, en ese caso, la acción instada por los peticionarios bajo el Código Judicial federal no podía ser considerada como una de revisión de la determinación de la Junta sobre la composición de la unidad apropiada, tal y como lo disponía la Ley Wagner, sino que era propiamente una acción para revocar una decisión de la Junta nacional dictada en contra de las disposiciones de ley. Íd.

Posteriormente, en *Boire v. Greyhound Corp.*, supra, el Tribunal Supremo federal explicó el alcance de la excepción establecida en *Leedom v. Kyne*, supra, y resolvió que bajo las circunstancias en ese caso no se justificaba aplicar la excepción aludida. Los pronunciamientos del Tribunal Supremo federal en *Boire v. Greyhound Corp.*, supra, aclaran precisamente por qué, en un caso como el de marras, sería aplicable la excepción establecida en *Leedom v. Kyne*, supra, que permite la intervención judicial que, de ordinario, no procedería en el ámbito federal. Veamos.

En *Boire v. Greyhound Corp.*, supra, el Tribunal Supremo federal resolvió que un tribunal de distrito no tenía facultad para atender el planteamiento de Greyhound Corp. en cuanto a que no era "patrono" para efectos de la ley en relación con una decisión dictada por la Junta fede-

ral en un procedimiento de certificación previo al procedimiento de práctica ilícita. El Tribunal Supremo federal resolvió esencialmente que la controversia en *Boire v. Greyhound Corp.*, supra, era distinta de la del caso de *Leedom v. Kyne*, supra, porque *Boire v. Greyhound Corp.*, supra, trataba *sobre una cuestión estrictamente de hecho* que, de ser resuelta a favor de Greyhound Corp., no afectaría el resultado de las elecciones, y en *Leedom v. Kyne*, supra, la controversia había sido *de derecho* que al ser resuelta a favor de los peticionarios había invalidado la orden dictada por la Junta.[8]

Vemos, pues, que en el caso de marras están presentes unas circunstancias parecidas a las de *Leedom v. Kyne*, supra, aun según la interpretación hecha en *Boire v. Greyhound Corp.*, supra. Como ya hemos señalado, de ser ciertos los planteamientos de la U.P.R., resultaría claro que la Junta actuó sin jurisdicción al dictar la orden de elecciones recurrida. Esta acción, sin lugar a dudas, sería en exceso de los poderes conferidos por ley a la Junta que, de haber causado daños a la U.P.R., da lugar a un remedio diferente al dispuesto en la Ley de Relaciones del Trabajo de Puerto Rico.

2. Otra de las excepciones, adoptada en la jurisdicción federal por analogía, resulta aplicable también al caso de marras. En *McCulloch v. Sociedad Nacional*, 372 U.S. 10 (1963), se permitió la revisión judicial directa de un proce-

---

[8] En *Boire v. Greyhound Corp.*, 376 U.S. 473 (1964), la Junta de Relaciones del Trabajo federal había certificado una unidad apropiada entre los empleados de mantenimiento que trabajaban en las estaciones de Greyhound Corp. bajo un contrato que ésta tenía con otra corporación conocida como "Floors, Inc.". Greyhound Corp. alegó que no era "patrono" para efectos de esa unidad apropiada porque Floors, Inc. era un contratista independiente y ella no mantenía control sobre sus empleados. En ese caso, distinto del caso de marras, la facultad de la Junta federal para dictar la orden de elecciones recurrida no se vería afectada por los planteamientos de Greyhound Corp. ya que, independientemente de sus méritos, como se había aceptado que la Junta había actuado correctamente respecto a Floors, Inc. y sus empleados, el resultado de la elección o las negociaciones con Floors no se verían afectadas. Dadas las circunstancias especiales del caso, el Tribunal Supremo federal resolvió que los planteamientos de Greyhound Corp. debían ser revisados colateralmente luego de haber celebrado las elecciones.

dimiento de certificación de unidad apropiada porque en aquel caso existían cuestiones de *gran interés nacional* que exigían la dilucidación de la controversia sin esperar por el procedimiento de práctica ilícita. En el caso de autos, aunque distinto de *McCulloch v. Sociedad Nacional*, supra, por estar en juego en este último intereses internacionales y no estrictamente insulares, existen circunstancias de gran interés público que, conforme con los mandatos de la Constitución y de la Ley de Relaciones del Trabajo de Puerto Rico, nos exigen que busquemos la solución más rápida para las partes.

En su moción en auxilio de jurisdicción, la U.P.R. alegó que la celebración de las elecciones ordenadas por la Junta sería altamente perjudicial para el mantenimiento de la paz institucional y el mejor desempeño de la labor académica en la Universidad debido a que, por entender que no es "patrono", la U.P.R. se vería obligada a negarse a negociar con la unión que resulte electa, para que entonces pueda solicitar una revisión de la orden de elecciones lo que, dado el historial de la U.P.R., con mucha probabilidad resultaría en un paro huelgario que afectaría su labor académica e institucional, ello sobre todo si se toma en cuenta el historial violento de la U.P.R. en casos de huelgas.

■ Como única universidad del Estado, y como la principal institución de educación superior del país con un extenso y extraordinario historial de aportaciones al bienestar general, la U.P.R. ostenta una posición única en nuestra sociedad, que merece gran consideración de parte de este Tribunal. Esta posición proviene de la encomienda legislativa que tienen tanto la U.P.R. como sus profesores de asegurar la educación de los sectores importantes de nuestra sociedad y de fomentar el desarrollo de la cultura de nuestro pueblo. 18 L.P.R.A. sec. 601. No se trata de una institución común u ordinaria, ni mucho menos del establecimiento industrial o comercial corriente que dispone la Ley de Relaciones del Trabajo de Puerto Rico.

La historia reciente de la U.P.R., que es de conocimiento de todos, demuestra que dicha institución ha sido el escenario de difíciles momentos de cambio y desarrollo que han resultado en choques violentos entre sus diferentes componentes en detrimento no sólo del esquema institucional de la Universidad, sino también de la formación de sus estudiantes y las condiciones de empleo de todo su personal, docente y no docente. Por ello, estamos de acuerdo con la U.P.R. en cuanto a que la celebración de elecciones, previo a que se determine la controversia ante nos, podría resultar altamente perjudicial para dicha institución, como no lo sería para un patrono usual. Se trata de un asunto del mayor interés público que no puede dejarse al trámite ordinario, conforme al sentido jurídico de la excepción reconocida por el Tribunal Supremo federal en *McCulloch v. Sociedad Nacional*, supra.

En conclusión, por los fundamentos expuestos resolvemos *que en el caso de marras* este Tribunal tiene jurisdicción para revisar la decisión y orden de elecciones dictada por la Junta en esta etapa de los procedimientos. Denegar ahora la jurisdicción que correctamente ejercimos al expedir el auto de revisión constituiría una crasa e injustificada abdicación de la primordial función que la Constitución nos impone. Ahora bien, nuestra decisión se ciñe a los hechos particulares de este caso, y cualquier imputación sobre supuestos peligros para la clase obrera resultantes de ella son pura exageración sin fundamento lógico o normativo alguno. Aquí la U.P.R. cuestiona la facultad de la Junta para dictar la referida orden a base de una controversia legítima de índole constitucional, que sólo a nosotros nos compete resolver, sobre si la U.P.R. es un "patrono" o no, y si los profesores son "empleados gerenciales" o no para efectos de los derechos de organización y negociación colectiva. En este caso también hemos tomado en consideración, al expedir el auto, la presencia de un alto interés público, el planteamiento de una cuestión jurídica novel y

la inminencia de un daño irreparable como resultado de la acción de la Junta.

Pasamos ahora a resolver los demás planteamientos.

## III

En nuestra jurisdicción, los derechos de los trabajadores a organizarse, negociar y llevar a cabo otras actividades concertadas tuvieron su origen en la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945 (29 L.P.R.A. sec. 61 *et seq.*) (en adelante la Ley)[9] que dispone:

> Los empleados tienen derecho, entre otros, a organizarse entre sí; a constituir, afiliarse o ayudar a organizaciones obreras; negociar colectivamente a través de representantes por ellos seleccionados; y dedicarse a actividades concertadas con el propósito de negociar colectivamente u otro fin de ayuda o protección mutua. Art. 4 (29 L.P.R.A. sec. 65).

Años después, estos derechos fueron incorporados a nuestra Constitución como sigue:

> Los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar. Art. II, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 329.

---

[9] La Ley Núm. 130 de 8 de mayo de 1945 (29 L.P.R.A. sec. 61 *et seq.*) —conocida como la Ley de Relaciones del Trabajo de Puerto Rico (en adelante la Ley)— utilizó como modelo la Ley Nacional de Relaciones del Trabajo de 1935 (29 U.S.C. sec. 151). Nuestra ley difiere de la ley federal principalmente en dos aspectos. En el área de práctica ilícita del trabajo la Ley le otorga a la Junta local el poder de supervisar los contratos colectivos (poder que en la jurisdicción federal pertenece a los tribunales). Segundo, específicamente incluye a los empleados agrícolas y a los de ciertas instrumentalidades corporativas gubernamentales en su alcance. Sin embargo, en la parte que nos concierne hoy, la del derecho a organizarse y negociar colectivamente, la ley local emula la ley federal y ha seguido el mismo rumbo jurisprudencial. Véase D. Fernández y C. Romany, *Derecho laboral: casos y materiales*, Río Piedras, Ed. U.P.R., 1987, T. I.

Es por eso que en Puerto Rico los derechos aludidos son de rango constitucional y las disposiciones estatutarias relativas a estos derechos deben aplicarse a tenor con la directriz constitucional. *J.R.T. v. Asoc. C. Playa Azul I*, supra, pág. 33; *J.R.T. v. Asoc. Servs. Médicos Hosp.*, 115 D.P.R. 360, 364–365 (1984); *Junta Rel. Trabajo v. Club Deportivo*, 84 D.P.R. 515, 519 (1962). Ahora bien, los derechos de organización y negociación colectiva no son absolutos y deben interpretarse "dentro del cuadro general de la sociedad con arreglo a las limitaciones inherentes a la vida común". *S.I.U. de P.R. v. Otis Elevator Co.*, 105 D.P.R. 832, 842 (1977); 4 Diario de Sesiones de la Convención Constituyente 2576 (1951). En numerosas ocasiones, en el ejercicio de nuestra función judicial hemos reconocido la necesidad de interpretar tanto las disposiciones estatutarias como las constitucionales para delimitar concretamente los respectivos derechos de las partes. Véase *Pérez v. Autoridad Fuentes Fluviales*, 87 D.P.R. 118 (1963).

 Las normas que aplican generalmente a casos como el de marras, que dimanan de la Constitución y de la Ley, según han sido interpretadas, están bien establecidas. Para que una persona o un grupo de personas puedan disfrutar los derechos a unionarse y negociar colectivamente, tales personas deben ser "empleados" dentro del alcance de la Ley. La definición de "empleado" que ésta contiene expresamente excluye a los individuos que trabajan en el servicio doméstico, a individuos empleados por sus padres o cónyuges, y a ejecutivos y supervisores. 29 L.P.R.A. sec. 63(3).[10] Existen también otras excepciones que han sido

---

[10] El Art. 2 de la Ley dispone, específicamente:

"El término 'empleado' incluirá a cualquier empleado, y no se limitará a los empleados de un patrono en particular, a menos que la ley explícitamente lo exprese en contrario, e incluirá a cualquier individuo cuyo trabajo haya cesado como consecuencia de, o en relación con cualquier disputa obrera, o debido a cualquier práctica ilícita del trabajo, pero no incluirá a ningún individuo empleado en el servicio doméstico en el hogar de cualquier familia o persona ni a ningún individuo empleado por sus padres o cónyuges. El término no incluirá ejecutivos ni supervisores." 29 L.P.R.A. sec. 63(3).

establecidas mediante interpretación administrativa o judicial y que recaen sobre el contratista independiente, el empleado confidencial, el empleado gerencial y aquel que pueda presentar un conflicto de intereses.[11]

 Desde 1946, la Junta, cuyas decisiones tienen un alto valor persuasivo en nuestra propia jurisdicción, según reiteraremos más adelante, ha excluido del concepto normativo de "empleado" a dos tipos de trabajadores que considera "gerenciales", debido a que desempeñan funciones que los relacionan o vinculan directamente con la política patronal, tal como es el caso de los empleados que están excluidos estatutariamente por ser "supervisores".[12] Los empleados gerenciales son: (1) aquellos cuyos intereses están vinculados con los de la gerencia porque comparten una "comunidad de intereses", y (2) aquellos que formulan o efectúan la política gerencial. *Conservatorio de Música de Puerto Rico*, Dec. de la J.R.T. Núm. D-1123 (1989). Véanse, además: *Palace Laundry Dry Cleaning Corporation*, 75 N.L.R.B. 320 (1947); *Ford Motor Company*, 66 N.L.R.B. 1317 (1946). En 1974 el Tribunal Supremo federal estableció que los "empleados gerenciales" no tienen derecho a negociar colectivamente. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974). Definió a tales empleados como aquellos que están alineados con la gerencia al llevar a cabo o recomendar acciones discrecionales que controlen o implanten

---

[11] La figura del *contratista independiente* se delimita en *Landrón v. J.R.T.*, 87 D.P.R. 94 (1963). En *Fábrica de Muebles Dimas*, Dec. de la J.R.T. Núm. D-134 (1955), la Junta excluyó a aquellas personas "que actúan y asisten en una capacidad confidencial a personas que desempeñan funciones de gerencia en el campo de relaciones obrero-patronales". Véanse, además: *Banco Gubernamental de Fomento*, Dec. de la J.R.T. Núm. D-594 (1971); *Autoridad de las Fuentes Fluviales de Puerto Rico*, Dec. de la J.R.T. Núm. D-465 (1968); *Unión de Empleados de la Compañía de Fomento Industrial*, Dec. de la J.R.T. Núm. D-333-S (1963). También se excluye a los empleados cuyas recomendaciones pueden afectar al personal de la empresa cuando su participación podría ocasionar conflicto de intereses entre la organización obrera y la gerencia. *Autoridad de Fuentes Fluviales de Puerto Rico*, supra.

[12] Nuestra Ley no define al "supervisor"; se limita a disponer que "empleado" no incluirá supervisores. 29 L.P.R.A. sec. 63(3). La Junta, a través de sus decisiones, ha adoptado la definición contenida en la Ley Nacional de Relaciones Obrero-Patronales en 29 U.S.C. sec. 152(11). *Banco Gubernamental de Fomento*, supra.

la política patronal de manera efectiva. *NLRB v. Yeshiva University*, supra, pág. 683. Éstos pueden ejercer su discreción, bien sea dentro de la política establecida por el patrono o independientemente de ella. *NLRB v. Yeshiva University*, supra; *NLRB v. Bell Aerospace Co.*, supra, págs. 286–288 (citando decisiones de la Junta federal).

Siguiendo esta jurisprudencia, la Junta local ha adoptado la norma de excluir de toda unidad apropiada de negociación colectiva a los empleados que estén íntimamente ligados al interés o quehacer gerencial. En *Autoridad de las Fuentes Fluviales de Puerto Rico*, Dec. de la J.R.T. Núm. D-465 (1968), la Junta certificó como apropiada para la negociación colectiva una unidad de profesionales que excluía a los "empleados íntimamente ligados a la gerencia ('closely allied to management')". Más tarde, en *Fondo del Seguro del Estado*, Dec. de la J.R.T. Núm. D-565 (1970), adoptó la norma de *NLRB v. Bell Aerospace Co.*, supra, de excluir tales empleados de *toda* unidad apropiada, norma reiterada en casos posteriores. En *Compañía de Turismo de Puerto Rico*, Dec. de la J.R.T. Núm. D-814 (1980), la Junta definió al empleado gerencial como aquel que: (1) tiene ideas, intereses y actitudes alineadas con las de la gerencia; (2) formula o determina la política y las normas administrativas y gerenciales del patrono en el curso de su trabajo, y (3) ejercita un alto grado de discreción para realizar su labor sin que tenga que conformarse a unas normas predeterminadas por el patrono. Véanse, además: *Compañía de Fomento de Turismo y Asociación de Inspectores de Juegos de Azar*, Dec. de la J.R.T. Núm. D-645 (1973); *Banco Gubernamental de Fomento*, Dec. de la J.R.T. Núm. D-594 (1971).

En *NLRB v. Yeshiva University*, supra, el Tribunal Supremo de Estados Unidos aplicó la doctrina de *NLRB v. Bell Aerospace Co.*, supra, a la facultad de la Universidad de Yeshiva y resolvió que quienes la constituían eran empleados gerenciales excluidos de la protección de la

ley. Al así resolver, el máximo foro judicial de Estados Unidos identificó, como consideración primordial en estos casos, la cuestión de si la facultad ejercitaba una autoridad que, en cualquier otro contexto, sería considerada gerencial. *NLRB v. Yeshiva University*, supra, pág. 686. *A base de este criterio, la autoridad de los profesores sobre asuntos académicos fue estimada como una de las funciones "gerenciales" de mayor importancia.* Para ilustrar este criterio, el Tribunal Supremo federal estableció una analogía entre el sector industrial y el mundo universitario, en la cual comparó la gerencia de una corporación con la facultad de la universidad. Desde ese punto de vista, destacó la participación activa de los profesores en áreas que en el contexto industrial serían consideradas gerenciales. Por ejemplo, el Tribunal Supremo federal consideró que los profesores ejercen cierto grado de autoridad sobre el "producto" que ofrece la universidad, al determinar qué clases se han de ofrecer; sobre los "términos de venta", al determinar cuándo se deben ofrecer las clases y a cuántos créditos equivalen, y sobre los "clientes" atendidos, al determinar las guías de admisión a la universidad, los prerrequisitos para tomar sus clases y los criterios para determinar si un "cliente" o estudiante es admitido a clase y puede permanecer en ésta. *NLRB v. Yeshiva University*, supra.([13]) Finalmente, el Tribunal determinó que los miembros de la facultad de Yeshiva eran empleados gerenciales porque ejercían un control determinante sobre cuestiones académicas a través de su participación en reuniones y organismos claustrales; además, porque ocupaban un papel predominante en decisiones no académicas que afectaban sus condiciones de trabajo, aun cuando la decisión final fuese de un cuerpo administrativo central.

---

([13]) En su decisión, el Tribunal Supremo federal no intentó establecer una norma de aplicación general a todos los casos de universidades. En una nota al calce explicó que resultaría impropio denegar la protección de la ley cuando la autoridad de los profesores se limite exclusivamente a sus propios cursos, estudiantes e investigación. *NLRB v. Yeshiva University*, 444 U.S. 672 esc. 31 (1980).

Como puede observarse, el concepto de "empleado gerencial" que se elabora en *NLRB v. Yeshiva University*, supra, no es el que tradicionalmente se había aplicado en la doctrina laboral federal, sino más bien una *adaptación analógica* de dicho concepto al contexto universitario. El Tribunal Supremo de Estados Unidos se vio en la necesidad de aplicar al ámbito académico una normativa propia del mundo industrial y, por analogía, hizo uso del concepto de "empleado gerencial", adecuándolo al nuevo contexto y dándole en *NLRB v. Yeshiva University*, supra, un sentido muy particular, conforme a las realidades del contorno universitario, tan distintas de las del mundo industrial de donde provino dicho concepto.

En dos decisiones posteriores al caso de *NLRB v. Yeshiva University*, supra, la propia Junta ha desarrollado un criterio que ella misma considera más restrictivo que el de la doctrina federal. En *Autoridad de Energía Eléctrica*, Dec. de la J.R.T. Núm. D-900 (1982), la Junta resolvió que sólo debe ser excluido de la unidad apropiada el empleado gerencial que en la ejecución de la política gerencial *"pueda afectar directa o indirectamente el "status" de otros trabajadores"*. En el caso de *Conservatorio de Música de Puerto Rico*, supra, la Junta aplicó este criterio a la luz de lo resuelto en *NLRB v. Yeshiva University*, supra, y determinó que los profesores del Conservatorio no eran empleados gerenciales porque no intervenían de forma directa en la determinación de la política de personal, administrativa o financiera. Sin embargo, tomando en cuenta el criterio de *NLRB v. Yeshiva University*, supra, la Junta admitió que en determinadas circunstancias la intervención del profesorado en la implantación de normas académicas podía afectar indirectamente el *status* de empleo del personal docente. Por lo tanto, en casos en los que la unidad apropiada solicitada esté integrada por profesores, la Junta resolvió que se debe determinar *si el efecto que produce la intervención de los profesores en la implantación de nor-*

*mas académicas es "significativo, real y efectivo", en cuyo caso éstos se deben excluir de la unidad.* La dirección tomada por la Junta local, pues, es similar a la que prevalece en la jurisdicción federal.

## IV

En el caso ante nos, la Junta determinó que los profesores de la U.P.R. no pueden ser considerados "empleados pertenecientes a la gerencia universitaria". Para llegar a esta conclusión, la Junta se fundó esencialmente en cuatro argumentos, uno en cuanto a la doctrina aplicable y tres sustantivos de derecho.

Su primer argumento es que la decisión de *NLRB v. Yeshiva University*, supra, no es de aplicación mandatoria; que dicha decisión es una interpretación de la legislación federal que no aplica a instituciones públicas estatales. No tiene razón la Junta. El fundamental asunto en cuestión no se reduce a si la decisión de *NLRB v. Yeshiva University*, supra, es "mandatoria" o no, como superficialmente lo estimó la Junta. El asunto, más bien, es si la norma de *NLRB v. Yeshiva University*, supra, es la apropiada para decidir este caso.

Es correcto que la Ley local es la que aplica en este caso. Bajo la ley federal equivalente, universidades públicas como la U.P.R. no son "patronos", por considerarse entes de los estados; por lo tanto, el régimen federal de organización y negociación colectiva no les aplica. 29 U.S.C. sec. 152(2). Sin embargo, el hecho de que el Congreso de Estados Unidos no haya decidido extender los derechos laborales federales a estas instituciones no nos impide adoptar para el caso ante nos la norma anunciada en *NLRB v. Yeshiva University*, supra. Dicha norma no fue expresamente estatuida por el Congreso en la legislación federal. Más bien, fue adoptada motu proprio por el Tribunal Supremo norteamericano, como parte de su interpretación del concepto

medular estatutario de "empleado", en torno del cual también gira esencialmente nuestra propia legislación. La ley federal no considera expresamente al empleado "gerencial", pero el máximo foro judicial federal ha desarrollado dicho concepto jurisprudencialmente y, por razones similares, en Puerto Rico procede también su incorporación a nuestra normativa.

■ Como se sabe, nuestro propio derecho laboral, que tiene al derecho federal como modelo y que en gran medida es sólo supletorio de éste, se nutre continuamente de normas federales que se incorporan a nuestro Derecho por la pertinencia y vinculación que este Tribunal les reconoce. *Bruno López v. Motorplan, Inc. y otros*, 134 D.P.R. 111 (1993); *Pérez Maldonado v. J.R.T.*, supra. Adoptamos dichas normas movidos por el fundamental criterio de que es parte de nuestra función inherente incorporar principios y doctrinas de otras jurisdicciones, cuando ello es necesario para resolver casos concretos, en armonía con el derecho vigente y si ello es lo más indicado y conveniente conforme a nuestra realidad económica, social y cultural. *Collazo Cartagena v. Hernández Colón*, 103 D.P.R. 870 (1975); *Pueblo v. Batista Maldonado*, 100 D.P.R. 936 (1972); *Pereira v. I.B.E.C.*, 95 D.P.R. 28 (1967). Se trata del acervo supletorio que jurisprudencialmente se va formando en torno a los estatutos, en particular respecto a materias especiales. *Rosario v. Atl. Southern Ins. Co. of P.R.*, 95 D.P.R. 759 (1968).

Debe notarse que la propia Junta análogamente ha adoptado en sus decisiones las limitaciones federales —estatutarias y jurisprudenciales— referentes a las categorías de empleados. Véase D. Fernández y C. Romany, *Derecho laboral: casos y materiales*, Río Piedras, Ed. U.P.R., 1987, T. I, págs. 383–409. En efecto, ha sido la propia Junta quien ha adoptado y aplicado en Puerto Rico, en varias ocasiones, la normativa federal sobre los "empleados gerenciales". No puede ahora pretender divorciarse de ésta

o alegar que dicha normativa no es dispositiva del asunto en cuestión.

Más aún, repetidamente hemos resuelto que cuando en Puerto Rico se adopta una norma tomada de otra jurisdicción se adopta también la interpretación y el alcance que se le ha dado en su lugar de origen. *Pérez Maldonado v. J.R.T.*, supra, pág. 981; *Peña Clos v. Cartagena Ortiz*, supra, pág. 588; *Pueblo v. Reyes Bonilla*, 100 D.P.R. 265 (1971); *Luce & Co. v. Junta Relaciones del Trabajo*, supra, pág. 98 esc. 2; *Jiménez v. Jones*, 74 D.P.R. 260 (1953); *Corretjer v. Tribl. de Distrito*, 72 D.P.R. 754 (1951); *Nieves v. Jones, Jefe Interino Penitenciaría*, 72 D.P.R. 287 (1951); *Padilla v. Vidal*, 71 D.P.R. 517 (1950); *Legarreta v. Tesorero de P.R.*, 55 D.P.R. 22 (1939); *Vázquez v. Font*, 53 D.P.R. 265 (1938); *Díaz v. P.R. Railway, Light & Power Co.*, 21 D.P.R. 78 (1914). Ello es particularmente cierto en el campo del derecho laboral. *Pérez Maldonado v. J.R.T.*, supra; *Luce & Co. v. Junta Relaciones del Trabajo*, supra, pág. 98; *P.R.T.C. v. Unión Indep. Emp. Telefónicos*, 131 D.P.R. 171, 198 esc. 7 (1992).

Examinada nuestra Ley, no encontramos evidencia de que la Asamblea Legislativa de Puerto Rico haya considerado concretamente alguna vez si la facultad de la U.P.R. puede organizarse o no para negociar colectivamente. Tampoco existe jurisprudencia de este Tribunal que interprete la doctrina del "empleado gerencial". En vista a ello, y a la luz de lo que hemos señalado antes, para sopesar los demás argumentos de la Junta procede que decidamos si al aplicar la doctrina del "empleado gerencial" la Junta local actuó conforme a la jurisprudencia federal de la cual proviene dicha doctrina.

Para iniciar este análisis es menester examinar el esquema universitario ante nos y los diferentes niveles de participación de los profesores de la U.P.R. dentro de ese esquema, a la luz de la jurisprudencia federal y de las de-

cisiones de la Junta, para así determinar si los miembros de la facultad de la U.P.R. son "empleados gerenciales" o no y, por ende, si tienen derecho o no a organizarse y a negociar colectivamente.

## V

*Esquema de la U.P.R.*

La U.P.R. está compuesta por seis unidades institucionales que funcionan con autonomía académica y administrativa.[14] Al momento de ocurrir los hechos de este caso, el sistema central administrativo de la U.P.R. estaba gobernado por el Consejo de Educación Superior.[15] Le correspondía a este Consejo formular las directrices que regirían la orientación y el desarrollo de la U.P.R., examinar y aprobar las normas generales de funcionamiento propuestas por los organismos legislativos y administrativos de ésta, y supervisar la marcha general de la institución. La U.P.R. también tenía —y continúa teniendo— una Junta Universitaria, cuya función es "mantener integrado el sistema universitario, respecto a su planificación de conjunto", y asesorar al Presidente de la U.P.R. en cuanto a la coordinación de las diferentes unidades institucionales en sus aspectos académicos, administrativos y financieros. 18 L.P.R.A. sec. 605(c) y (d). Varios profesores forman parte de

---

[14] Estas unidades son los recintos de Río Piedras, de Mayagüez y de Ciencias Médicas; el Colegio Universitario de Cayey y el de Humacao, y la Administración de Colegios Regionales.

[15] Estando sometido este caso ante nos, la Junta de Síndicos fue creada por la Ley Núm. 16 de 16 de junio de 1993 (18 L.P.R.A. sec. 602). Dicha ley, en conjunto con la Ley Núm. 17 aprobada el mismo día —conocida como la Ley del Consejo de Educación Superior de Puerto Rico, 18 L.P.R.A. sec. 852 *et seq.*— tuvo el efecto de separar las funciones de licenciar y acreditar instituciones universitarias privadas, funciones que permanecieron a cargo del Consejo de Educación Superior, de las funciones correspondientes al gobierno de la U.P.R., que ahora pertenecen a la Junta de Síndicos. La constitucionalidad de ambas leyes ha sido impugnada y el asunto está pendiente de resolverse ante nos.

la Junta,([16]) por lo que fueron excluidos por dicha junta de la unidad apropiada mientras fuesen miembros de ella.

■ Cada unidad institucional tiene una Junta Administrativa que asesora al Rector de la unidad en el ejercicio de sus funciones y que comparte con éste algunas de las funciones académicas y administrativas principales de la unidad, tales como elaborar planes de desarrollo institucional, evaluar los presupuestos sometidos por los rectores y conceder las licencias, los rangos académicos, la permanencia y los ascensos del personal docente de la unidad. 18 L.P.R.A. sec. 607(c). La composición de la Junta Administrativa varía entre las unidades, pero las de los recintos de Río Piedras, Mayagüez y Ciencias Médicas, por ley, están compuestas por el Rector, los Decanos y dos profesores elegidos de entre los miembros del Senado Académico de la unidad institucional que no sean *ex officio*. Los profesores miembros de las Juntas Administrativas fueron excluidos por la Junta de la unidad apropiada, mientras sean miembros de ellas.

■ Los Senados Académicos de los recintos constituyen los foros oficiales de la comunidad académica para la consideración de los problemas generales que afecten la marcha de la Universidad. Éstos están integrados por el Rector, los Decanos, el director de la biblioteca y los *representantes electos de entre los profesores permanentes del claustro* correspondiente. 18 L.P.R.A. sec. 610(b). La composición de los Senados Académicos varía entre las unidades, pero la ley de la Universidad dispone que el número de senadores académicos elegidos por el claustro constará de por lo menos dos veces el número total de senadores académicos *ex officio*. 18 L.P.R.A. sec. 610(b)(4); Reglamento

---

([16]) La Junta Universitaria está compuesta por el Presidente de la U.P.R., quien la preside; los Rectores de los recintos universitarios; el Director de Finanzas de la U.P.R.; tres oficiales adicionales nombrados por el Presidente con aprobación del Consejo, y un representante electo por cada Senado Académico. 18 L.P.R.A. sec. 605(a).

General de la Universidad de Puerto Rico, Consejo de Educación Superior, diciembre de 1990, Sec. 23.4.5 (en adelante Reg. Gen. U.P.R.). Por ejemplo, en testimonio ante la Junta y en la Certificación Núm. 24 emitida por el Consejo de Educación Superior en 1979 se estableció que el Senado Académico del Recinto de Río Piedras está integrado por sesenta y tres miembros, de los cuales treinta y seis son profesores electos por el Claustro, catorce son miembros *ex officio* y trece son estudiantes. Las funciones concretas de los senadores, que en su inmensa mayoría son profesores, son varias. Estas son:

(1) Determinar la orientación general de los programas de enseñanza y de investigación en la unidad institucional, coordinando las iniciativas de las facultades y departamentos correspondientes.

(2) Establecer para su inclusión en el Reglamento General de la Universidad las normas generales de ingreso, permanencia, promoción de rango y licencias de los miembros del Claustro.

(3) Establecer los requisitos generales de admisión, promoción y graduación de los estudiantes.

(4) Entender en las consultas relativas a los nombramientos de los rectores y directores, y los decanos que no presidan facultades, conforme a lo dispuesto en este Capítulo.

(5) Elegir sus representantes en la Junta Universitaria y en la Junta Administrativa.

(6) Hacer recomendaciones al Consejo sobre la creación o reorganización de facultades, colegios, escuelas o dependencias.

(7) Hacer recomendaciones a la Junta Universitaria sobre el proyecto de Reglamento General de la Universidad que ésta le proponga.

(8) Someter a la Junta Universitaria, con sus recomendaciones, el proyecto de Reglamento de los Estudiantes.

(9) Hacer recomendaciones al Consejo para la creación y otorgamiento de distinciones académicas.

(10) Rendir anualmente un informe de su labor a los Claustros correspondientes.

(11) Establecer normas generales sobre todos aquellos asuntos del recinto o unidad institucional no enumerados en esta sección, pero que envuelvan responsabilidades institucionales en común. 18 L.P.R.A. sec. 610(d).

En el caso de autos, el "Proyecto de decisión y orden"

original de la Junta excluía de toda unidad apropiada a los profesores que fueran senadores académicos durante el desempeño de su función como tal. Sin embargo, en su decisión final la Junta optó por permitir su inclusión.

Continuemos con la descripción del esquema universitario; en lo pertinente, veamos la organización y las atribuciones del Claustro.

El Claustro de cada recinto o unidad institucional está integrado por sus Rectores, Directores, Decanos y profesores, y constituye un "organismo para laborar por el mejoramiento académico y el progreso cultural de la Universidad". 18 L.P.R.A. sec. 608(c). El Claustro de cada unidad o recinto, a su vez, se divide en unidades académicas independientes o "facultades" donde los claustrales se agrupan por disciplinas afines. Reg. Gen. U.P.R., Sec. 28.1. Por ejemplo, el Claustro del Recinto de Río Piedras está dividido aproximadamente en doce facultades, tales como Educación, Derecho, Administración de Empresas, Humanidades, Ciencias Sociales, Ciencias Naturales, etc. Es a este nivel que los claustrales participan directamente en los procesos universitarios. Reg. Gen. U.P.R., Sec. 27.3. Las facultades celebran por lo menos una reunión ordinaria por semestre y reuniones extraordinarias, como aquellas que se hacen para nominar y elegir senadores, según sea necesario. Reg. Gen. U.P.R., Sec. 28.2. Las facultades, a su vez, pueden estar subdivididas en disciplinas especializadas por departamentos. Así, la Facultad de Ciencias Sociales del Recinto de Río Piedras, por ejemplo, está compuesta por seis departamentos: Economía, Ciencias Políticas, Sociología y Antropología, Geografía, Sicología y Ciencias Sociales Generales. Dado que los departamentos están divididos por disciplinas más especializadas que las de las facultades, los claustrales comúnmente se reúnen a nivel departamental con más frecuencia y, por lo menos, dos veces por semestre. Reg. Gen. U.P.R., Sec. 29.4.

Por disposición de ley, el Reglamento General de la

U.P.R. determina las funciones, las atribuciones y la organización de los claustrales dentro de cada facultad y departamento. 18 L.P.R.A. sec. 608(b). A nivel departamental, *este reglamento provee de manera general que los profesores, junto con su director, puedan llegar a acuerdos y hacer recomendaciones para lograr el desarrollo más efectivo de los objetivos departamentales, incluyendo el establecimiento de normas educacionales y aprobar los programas de estudio de las especialidades, opciones y concentraciones del departamento.* Reg. Gen. U.P.R., Sec. 29.5. Cómo se llevan a cabo estas funciones dentro de cada facultad está dispuesto mediante un reglamento interno y puede variar de acuerdo con las particularidades de cada facultad. Sin embargo, cada reglamento tiene que garantizar los deberes y derechos conferidos a los profesores por la Ley y el Reglamento.

Por ejemplo, el Reglamento de la Facultad de Ciencias Sociales, aprobado el 8 de agosto de 1962, dispone que un profesor miembro de dicha facultad

...podrá exponer sus puntos de vista al Rector, Senado Académico, a la Junta Universitaria y al Consejo Superior de Enseñanza sobre cualquier asunto relacionado con la buena marcha de la institución, entre otros, criterios sobre promoción tarea académica y licencias, y la creación, modificación o eliminación de departamentos o dependencias de la Facultad.

El Reglamento de la Facultad de Administración de Empresas, adoptado el 9 de mayo de 1969, es mucho más detallado y abarcador. Entre los deberes de la facultad incluye:

1. Introducir cambios en el Reglamento de la Facultad.
2. Estudiar las normas universitarias vigentes y proponer mejoras a las mismas.
3. Aceptar, rechazar o modificar recomendaciones con respecto a programas académicos. Toda recomendación de esta clase deberá venir a la Facultad a través del Comité de Currículo.
4. Evaluar por medio de investigaciones periódicas los resultados de los cursos.

5. Realizar o disponer que se realicen estudios tendientes a adecuar mejor la labor docente y de investigación de la Facultad de *Administración de Empresas* a las necesidades de Puerto Rico. Disponer cambios en los programas de estudio con el fin de ampliarlos, mejorarlos o intensificarlos a tono con estas investigaciones.

Entre los derechos expresamente reconocidos a los claustrales en esta facultad están los siguientes:

5. Todo profesor permanente tendrá derecho a que se le consulte previamente antes de separarlo de una disciplina que ha enseñado por tres (3) años o más.

6. Antes de sustituir o eliminar una disciplina, los miembros de los departamentos afectados tendrán derecho a que se les consulte.

. . . . . . . .

12. Tendrá derecho a presentar propuestas sobre cualquier cuestión que interese a la Facultad, o a su departamento en particular; a solicitar la reconsideración de cualquier acuerdo, decisión o actuación; y a apelar ante los funcionarios y organismos correspondientes.

. . . . . . . .

14. Participar en los procesos de consulta para efectuar los nombramientos que se establecen en el Reglamento General de la Universidad de Puerto Rico.

15. Participar en los distintos procesos de elección aplicables a su departamento, facultad o unidad institucional, sujeto a las disposiciones establecidas en el Reglamento General de la Universidad de Puerto Rico.

Los profesores, además, pueden participar en comités de sus departamentos y a nivel de Facultad. El número de miembros de los comités departamentales y de la Facultad varía según el tamaño de la Facultad, *pero la mayoría de estos comités están integrados principalmente por profesores electos directamente por el Claustro a nivel departamental.* Cada departamento y Facultad crea los comités que estime necesarios para el desempeño de sus labores. Excepto los comités de personal, los demás comités de Facultad de carácter permanente son adoptados mediante el reglamento interno de cada Facultad.

Los comités de personal están regidos por disposiciones especiales del Reglamento General de la U.P.R. El comité de personal de cada departamento está integrado exclusivamente por profesores con nombramientos permanentes que *son electos por todos los miembros del departamento.* Reg. Gen. U.P.R., Secs. 29.7 y 29.9. Estos comités asesoran al director sobre las acciones de personal. Los profesores miembros del comité de personal de la Facultad asesoran al Decano sobre *"nombramientos, permanencias, ascensos, licencias, traslados, bonificaciones y otras acciones que directamente concierne a los profesores".* (Énfasis suplido.) Reg. Gen. U.P.R., Sec. 29.9, pág. 65. Estos comités de Facultad preparan sus recomendaciones mayormente a base de los informes y las recomendaciones de los comités departamentales. Los profesores que integran estos comités de personal evalúan, además, la calidad de la enseñanza de sus colegas a través de visitas a los salones de clase, y diseñan y aprueban los métodos de evaluación que se utilizan. La prueba presentada por la propia Asociación demostró que las recomendaciones de estos comités son adoptadas en la mayoría de los casos. Por ello, la Junta consideró necesario excluir a estos profesores de la unidad apropiada; *exclusión que es por demás muy abarcadora.* En autos obra un informe emitido por la Oficina de Personal de la U.P.R. en mayo de 1988 que demuestra, por ejemplo, que para ese año la exclusión de la Junta hubiera afectado a *212 profesores que integraban comités de personal en el Recinto de Río Piedras* y un total de *1,012 profesores que participaban en comités de personal dentro del sistema universitario completo.*

Existen otros comités permanentes cuyas funciones son muy variadas y que están dirigidas a proveerle a los profesores una participación amplia en cuestiones administrativas y académicas. Por ejemplo, la Facultad de Administración de Empresas tiene seis comités permanentes a nivel de facultad, además del de personal. Estos son: el

Comité Asesor de la Facultad, el Comité de Currículo, el Comité de Asuntos Claustrales, el Comité Conjunto de Estudiantes y Profesores, el Comité de la Escuela Graduada y el Comité de Biblioteca. La Facultad de Derecho tiene cinco comités permanentes divididos en áreas similares. Estos son: el Comité de Programas y Normas Académicas (*de Currículo*), el Comité de Admisiones, el Comité de Personal y Presupuesto, el Comité de Asuntos Estudiantiles y el Comité de Investigación y Biblioteca. Del mismo modo, las diferentes Facultades tienen sus comités sobre los cuales recae, en coordinación con los comités departamentales, la formulación de normas concretas y la aplicación de éstas en su Facultad en las áreas de mayor importancia para la vida universitaria, incluyendo normas académicas, administrativas y de personal.

En el área académica se destacan los *comités de currículo*, que preparan y aprueban propuestas de nuevos cursos y programas académicos de acuerdo con las *ideas generadas por los profesores*; los comités que hacen recomendaciones sobre los requisitos de admisión y graduación de estudiantes y los prerrequisitos para tomar ciertas asignaturas y los que recomiendan distinciones académicas para el Claustro y otras personas.

En el área administrativa, la mayoría de las Facultades tienen comités que asesoran a su Decano. Por ejemplo, la Facultad de Ciencias Sociales tiene un Comité Coordinador, cuyas atribuciones incluyen asesorar al Decano sobre las normas de aplicación general en materias de planes y programas, personal, presupuestos y planta física. Así también, los Decanos por lo general trabajan en colaboración con comités de la Facultad para preparar el presupuesto de su Facultad antes de someterlo al Rector.

Además de los comités de personal, algunas Facultades tienen comités que asesoran al Decano sobre los problemas generales del claustro. Por ejemplo, el Comité de Asuntos Claustrales de la Facultad de Administración de Empresas

asesora al Decano sobre problemas de ética, disciplina y relaciones entre los miembros de la Facultad; estudia y hace recomendaciones que afectan las funciones, las responsabilidades y los derechos del personal docente e investiga por iniciativa propia o por encomienda del Decano cualquier caso relacionado con el incumplimiento de obligaciones por parte de un profesor, violación a sus derechos o conflicto entre claustrales, y recomienda al Decano la solución más adecuada.

Algunos profesores también ocupan puestos administrativos a la vez que ejercen sus tareas magisteriales como lo hacen de ordinario los Rectores, Decanos, Decanos asociados y auxiliares, y jefes y directores de departamentos. Éstos, junto con los profesores miembros de los comités de personal, de la Junta Universitaria y de las Juntas Administrativas, están fuera de la unidad apropiada propuesta por la Junta. Nótese, pues, que el decreto de la Junta tiene, de por sí, el efecto de excluir de la negociación colectiva a una porción sustancial del profesorado de la U.P.R., que suma cientos de éstos.

Para completar la descripción del esquema universitario, debemos delimitar depuradamente la controversia ante nos. Nos toca resolver cómo deben clasificarse, para fines laborales, los profesores de la U.P.R. quienes, según la Junta, integrarían la unidad apropiada para la negociación colectiva. Según se ha señalado ya, la Junta *excluyó* de dicha unidad una parte sustancial de los profesores universitarios: aquellos que forman parte de los comités de personal de los departamentos y Facultades del recinto; los que forman parte de la Junta Administrativa o de la Junta Universitaria, y los que ocupan cargos directivos o administrativos, tales como Rector, Decano, Decanos asociados, Decanos auxiliares, jefes de departamentos y otros. La Junta no excluyó a otros *dos* grandes grupos de profesores, quienes son los que integrarían la unidad apropiada objeto de controversia en este caso. Uno de estos otros dos grupos

lo constituyen los cientos de profesores que son parte del entramado decisional universitario, principalmente respecto a *cuestiones académicas.* Se trata de los profesores que son miembros del Senado Académico del recinto, o que son miembros de los muchos comités que formulan o aplican las normas académicas concretas en el nivel departamental o de Facultad, tales como los comités de currículo, comités de admisiones, comités de asuntos estudiantiles, comités de biblioteca y otros. El otro grupo lo constituyen los profesores que, *de momento,* no pertenecen a ninguna de las estructuras identificadas antes, excepto la del Claustro. Es decir, no ocupan cargos universitarios ni forman parte de ningún comité departamental o de Facultad ni del Senado Académico.

Nótese que la participación en los organismos universitarios, tanto en los comités —incluyendo los de *personal*— como en el Senado, es *electiva y de corta duración.* Hoy un profesor puede ser miembro del Senado, del comité de personal o del comité de currículo y mañana dejar de serlo. *No son, por así decirlo, cargos de "carrera".* Tienden a ser, más bien, *rotativos.* En cualquier momento dado, sin embargo, habrá profesores que no pertenezcan a ninguno de estos comités o cargos. En ese momento constituirán el tercer grupo de profesores ante nuestra consideración. Estos profesores son, sin embargo, miembros del Claustro cuando éste es convocado ocasionalmente a nivel del recinto o periódicamente a nivel de departamento o Facultad. En dichas reuniones claustrales todos los profesores, aun los que no pertenecen de momento a algún comité o al Senado, expresan sus criterios y puntos de vista, hacen recomendaciones y formulan propuestas concretas sobre *todas las cuestiones universtarias*, principalmente las académicas. En esas reuniones claustrales todos los profesores *emiten sus votos* sobre los asuntos ante la consideración del Claustro, que con frecuencia son precisamente las normas académicas concretas que los comi-

tés han de aplicar o los asuntos a someterse al Senado Académico. En esas reuniones claustrales, además, los profesores *eligen* a sus colegas quienes han de integrar posteriormente por períodos limitados los varios comités departamentales o de Facultad, incluso los *comités de personal.* También se eligen los que habrán de representarlos en el Senado Académico.

Estas reuniones claustrales en sus distintos niveles —departamental, de Facultad o de Recinto— son la expresión formal de la *comunidad académica* a la que pertenecen los profesores universitarios. Sobre todo a nivel departamental, los profesores constituyen sociológicamente un grupo profesional vivo, debido a que desempeñan labores comunes, encaran retos y dificultades similares, comparten metas y afanes, poseen experiencias, modos de actuar y pensar, y una formación intelectual esencialmente parecida. *Como experiencia cotidiana,* estos profesores dialogan intensamente sobre lo que los une y los separa. Discuten lo que acontece en sus clases, sus proyectos de investigación, sus publicaciones recientes o contempladas, los problemas del país particularmente relacionados con sus disciplinas académicas especializadas, los asuntos propios relativos a dichas disciplinas y las cuestiones universitarias que les afectan o interesan. Este intenso diálogo cotidiano de los profesores con frecuencia se refleja de manera más formal en las reuniones claustrales, en las cuales, con frecuencia, toman decisiones que, en mayor o menor grado, inciden sobre su quehacer universitario.

El proceso comunitario al que aludimos no está regido ciertamente por visiones comunes en todo lo esencial. Existen hondas diferencias ideológicas o intelectuales que separan y dividen a los profesores universitarios en todos los niveles. Estas diferencias explican en parte por qué su discusión es siempre vigorosa, con frecuencia discordante. Estas diferencias en ocasiones se reflejan en los votos que emiten los profesores respecto a los asuntos universitarios,

sobre todo, cuando eligen a los que van a integrar por un tiempo los distintos comités departamentales o de Facultad, o el Senado Académico. Estas diferencias son un elemento natural de la particularísima comunidad universitaria que, comprometida con la búsqueda de la verdad como quehacer esencial, es inevitablemente pluralista. El que existan, como deben existir, no desvirtúa su condición comunitaria ni niega el *estrecho entrelazamiento* que caracteriza las labores de los profesores universitarios.

## VI

Habiendo visto el esquema universitario, pasamos ahora a examinar los tres argumentos sustantivos de la Junta. El primero es que los profesores no excluidos de la unidad apropiada no pueden ser considerados empleados gerenciales porque su función dentro de la estructura administrativa de la U.P.R. es "puramente asesora". El segundo es que el concepto de "autoridad colegiada" no aplica al profesorado de la U.P.R., y que la participación de los profesores en los diferentes comités y organismos administrativos no ha de presentar un problema de conflicto de intereses o lealtad dividida —dentro de la unidad apropiada— que justifique la exclusión. Finalmente, la Junta adujo que las labores que llevan a cabo los profesores en cuestión no pueden ser caracterizadas como gerenciales porque son funciones sobre aspectos puramente académicos "inherentes a la profesión del magisterio".

Los argumentos referidos de la Junta no nos persuaden. Consideramos que sobre estos asuntos la Junta interpretó el caso *NLRB v. Yeshiva University*, supra, equivocadamente. Pasemos a señalar concretamente por qué los tres argumentos de la Junta no son válidos.

A. En primer lugar, el hecho de que la participación de los profesores en tareas propiamente administrativas sea de carácter principalmente consultivo no im-

pide determinar que, para fines laborales, se les considere como "empleados gerenciales". Tener autoridad absoluta o final sobre las funciones administrativas no es un requisito del concepto normativo de "empleado gerencial"; nunca ha sido un requisito para las figuras análogas del supervisor o ejecutivo, que están específicamente excluidas de la negociación colectiva por la Ley.([17]) En *NLRB v. Yeshiva University*, supra, el Tribunal Supremo federal determinó que el elemento de control sobre lo administrativo no es necesario, debido a que la ley federal expresamente da carácter de "supervisores" a quienes sólo "recomiendan de manera efectiva".([18]) La exclusión del "empleado gerencial" de la unidad apropiada responde a la misma razón que la exclusión del "supervisor": asegurar que la lealtad de los empleados no se divida o se diluya. *NLRB v. Yeshiva University*, supra, pág. 683 esc. 17. Por eso, el Tribunal Supremo federal determinó que el criterio apropiado para este asunto es si los profesores pueden recomendar de manera efectiva y no el criterio de si tienen autoridad final o absoluta. Íd. Señaló, además, el máximo foro judicial federal, que la autoridad final en todo tipo de organización normalmente recae sobre un cuerpo de mayor jerarquía, como lo es la junta de directores en las corporaciones privadas, y ello no impide que otros funcionarios de menor rango se consideren "gerenciales". Igual sucedería, según el Tribunal Supremo federal, respecto a las universidades. *NLRB v. Yeshiva University*, supra, pág. 685 esc. 21. En efecto,

---

([17]) Este argumento aplica también a la legislación federal. Véase G.A. Bodner, *The Implications of the Yeshiva University Decision for Collective Bargaining Rights of Faculty at Private and Public Institutions of Higher Education*, 7 (Núms.1–2) J.C. & U.L. 78, 85–86 (1980–1981).

([18]) La definición de la ley federal dispone:

"The term supervisor means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, *or effectively to recommend such action*, if in connection with the forgoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." (Énfasis suplido.) 29 U.S.C. sec. 152(11).

tanto en el caso de la Universidad de Yeshiva como en las decisiones posteriores de la Junta federal se ha aplicado la exclusión del "empleado gerencial" a profesores y a otros empleados de universidades aunque no hayan tenido control o autoridad final, debido a que en dichas universidades la autoridad final recaía sobre una junta de síndicos o un cuerpo administrativo central similar al de la U.P.R. Véanse: *Lewis & Clark College*, 300 N.L.R.B. 155 (1990); *Livingstone College*, 286 N.L.R.B. 1308 (1987); *American International College*, 282 N.L.R.B. 189 (1986); *Ithaca College*, 261 N.L.R.B. 577 (1982); *Thiel College*, 261 N.L.R.B. 580 (1982); *Duquesne University*, 261 N.L.R.B. 587 (1982).([19]) Además, como hemos visto, la exclusión del "empleado gerencial" ha sido utilizada por la propia Junta, fuera del contexto universitario, respecto a funcionarios de instrumentalidades corporativas gubernamentales en las cuales la autoridad final está mucho más centralizada que la de la U.P.R. En resumen, pues, un profesor se considera "gerencial" y, por lo tanto, excluido del derecho a negociar colectivamente si puede hacer recomendaciones efectivas sobre asuntos universitarios. Erró la Junta al determinar que los profesores de la U.P.R. que tenían funciones consultivas no podían considerarse como "empleados gerenciales" sin indagar si sus recomendaciones eran efectivas o no.

En cuanto a las labores de los profesores-senadores, la Junta también se equivocó al aducir que sus funciones son mayormente de índole reglamentaria general y que, por

---

([19]) En todas estas decisiones de la Junta federal, similar al caso de marras, la participación de los profesores era mayormente a través de *comités asesores* sujeta a la aprobación final del Presidente y de la Junta de Síndicos de las diferentes universidades. Los casos citados por la Junta en los que la Junta Nacional resolvió que la participación de los profesores en comités no justificaba la exclusión son distinguibles del caso de autos. Por ejemplo, en *N.L.R.B. v. Cooper Un. for Advancement of Science*, 783 F.2d 29 (2do Cir. 1986), el tribunal determinó que el hecho de que la universidad después de rehusarse a negociar unilateralmente cambiara los términos de empleo de los profesores, era evidencia contundente de la falta de participación de los profesores en los mecanismos administrativos. Igualmente distinguible es el caso *Loretto Heights College v. N.L.R.B.*, 742 F.2d 1245 (10mo Cir. 1984), en el que el trabajo colegiado de los profesores era mínimo, infrecuente, irregular y de muy poca importancia en comparación con las otras funciones de la facultad.

consiguiente, no afectan a los profesores de manera *específica e individual.* Aquí, de nuevo, la Junta afirmó un criterio incorrecto. Lo correcto, según sus propias decisiones, era determinar si las funciones de los profesores-senadores afectaban el *status* de los claustrales *directa o indirectamente.* En el "Proyecto de decisión y orden" original, la Junta correctamente excluía de toda unidad apropiada a los profesores que fueran senadores académicos, porque ésta entendía —en aquel momento— que los senadores actuaban "dentro de un cuerpo que emite recomendaciones que podrían afectar el status de otros profesores". La Junta, sin embargo, luego cambió de parecer, erróneamente. Si se examinan cuidadosamente las funciones del Senado Académico, es evidente que éste puede dictar normas que afecten el quehacer de los profesores, tanto en sus labores docentes (al reglamentar la calidad y cualidad de los servicios académicos que ofrecen) como en su carácter como miembros del claustro de la U.P.R., al determinar el contenido de los reglamentos internos de la facultad y los departamentos y sus condiciones de trabajo. El impacto real y significativo de las decisiones de los senadores sobre los claustrales es innegable, tanto directa como indirectamente. Los profesores-senadores, pues, debieron considerarse como empleados gerenciales y, como tales, excluidos de la unidad apropiada.

La inconsistencia de la Junta al aplicar sus propias normas se evidencia de manera patente también en su determinación de que los profesores miembros de los comités de personal no son "empleados gerenciales", a pesar de haberlos excluido de la unidad apropiada. Esta posición es claramente errónea. La Junta estaba lógica y conceptualmente obligada a determinar que dichos profesores cumplían con el criterio de "empleado gerencial", debido a que para su exclusión ya había determinado que los miembros de los comités de personal participaban directamente en un proceso que "puede afectar significativa, real y efec-

tivamente el status de empleo o las condiciones de trabajo" de los profesores.

Debe señalarse, además, que la Junta también debió haber considerado como "empleados gerenciales" a los profesores que son miembros de los diversos comités permanentes de departamento y de Facultad. Como hemos señalado ya, estos profesores, a través de la encomienda reglamentaria que tienen sus respectivos comités, participan activamente en la formulación de normas concretas y en su aplicación. Particularmente a nivel departamental, su intervención en la implantación de la política institucional es "significativa, real y efectiva", por lo que conforme a la propia definición normativa de la Junta, debían excluirse de la unidad apropiada.

B. La Junta erró, además, al no aplicar al caso ante nos el concepto de "autoridad colegiada" (*collegiality*), aun cuando reconoció que tal es la tendencia de la Junta federal en casos como el de marras.

■ Aun antes de la decisión en *NLRB v. Yeshiva University*, supra, se había reconocido, en la jurisprudencia federal, la figura de la "autoridad colegiada" como un fenómeno propio del campo de la educación, sin par en el ámbito industrial. *NLRB v. Yeshiva University*, supra, págs. 680–681, citando las decisiones de la Junta federal en *Syracuse University*, 204 N.L.R.B. 641, 643 (1973), y en *Adelphi University*, 195 N.L.R.B. 639, 648 (1972). Según esta normativa, se considera que hay "autoridad colegiada" si existen cuerpos representativos y otros mecanismos institucionales que, en efecto, incorporan el asesoramiento o conocimiento especializado de los profesores en el proceso de formulación o implantación de la política universitaria. La posición del Tribunal Supremo federal en *NLRB v. Yeshiva University*, supra, respondió precisamente a esta diferencia entre el modelo industrial y la realidad universitaria. *NLRB v. Yeshiva University*, supra, pág. 680. *En el modelo industrial las opiniones y las ideas de los*

*obreros no tienen el efecto sobre las políticas patronales que las de los profesores tienen sobre las políticas universitarias.* Por eso existe en la universidad un elemento de *collegiality*, o autoridad colegiada, que no existe en las empresas industriales. Se trata de uno de los factores que crucialmente distinguen la situación de los profesores universitarios de la de los obreros tradicionales.

En apoyo de su posición, la Junta utilizó expresiones de la Junta Nacional en casos muy distintos al nuestro, anteriores a la decisión de *NLRB v. Yeshiva University*, supra, que interpretaron la figura de la autoridad colegiada en *otros contextos*.[20] La Junta también descansa en su decisión en *Conservatorio de Música de Puerto Rico*, supra. Este último caso, sometido ante la Junta en el mismo año que el que está ante nos ahora, se distingue con claridad del de marras, precisamente a base de las propias determinaciones de la Junta. En *Conservatorio de Música de Puerto Rico*, supra, la Junta determinó que los profesores miembros del Senado Académico sólo representaban las opiniones del Claustro y no las de la gerencia, porque la función de los profesores en dicho Senado se limitaba a ofrecer meros comentarios sobre la adecuacidad de cambios curriculares propuestos exclusivamente por la administración. En el caso ante nos, por el contrario, el Senado Académico universitario tiene poderes propios conferidos por ley que le autoriza a tomar la iniciativa y a formular aspectos de política universitaria. Ello hace claramente aplicable aquí el concepto de "labor colegiada del claustro", sobre todo si se considera además la extensa par-

---

[20] Por ejemplo, en los casos de *Adelphi University*, 195 N.L.R.B. 639 (1972), y *Fordham University*, 193 N.L.R.B. 134, 135 (1971), la Junta Nacional resolvió que la autoridad de la Facultad, en asuntos relacionados con la política pública de la universidad ejercida colectivamente, no es suficiente para convertir a los profesores individualmente en "supervisores". Tampoco es relevante el caso de *Syracuse University*, 204 N.L.R.B. 641 (1973), en el que la Junta Nacional utiliza el concepto de autoridad colegiada para determinar que la facultad de derecho, como miembros de la profesión de la abogacía, puede permanecer separada de sus "colegas" en su "otra profesión", la del magisterio.

ticipación de los profesores en los distintos comités de departamento y Facultad, en las reuniones claustrales y aun en cuerpos administrativos de la institución.[21] En efecto, si se toman en cuenta, a la vez, las numerosas y variadas maneras en que el profesorado universitario participa en la formulación y aplicación de las normas académicas, resulta innegable que en la U.P.R., al menos en el Recinto de Río Piedras, que es el que nos concierne aquí, *las opiniones e ideas de los profesores tienen un notable efecto sobre el quehacer universitario.* Su asesoramiento sin duda se incorpora de diversas maneras en los procesos de formulación e implantación de las políticas universitarias. El impacto del pensamiento claustral se hace particularmente evidente cuando se compara con la situación de los otros empleados universitarios. Los obreros de limpieza y mantenimiento, los guardias de seguridad, los mensajeros, las secretarias y otros trabajadores de oficina de la U.P.R. están en una posición *cualitativamente* distinta a la de los profesores en lo que se refiere a sus respectivas intervenciones en la formulación e implantación de las políticas universitarias, sobre todo aquellas estrictamente académicas. Respecto a éstas, existe "autoridad colegiada", como la que no tienen los obreros en el modelo industrial. En este aspecto fundamental, la situación de los profesores del Recinto de Río Piedras no es esencialmente distinta a la de los profesores de la Universidad de Yeshiva.

Al rechazar la autoridad colegiada de la Facultad, la Junta también determinó que el carácter representativo del profesor-senador no presentaría un problema de conflicto de intereses o lealtad dividida dentro de la unidad apropiada que justificara su exclusión de ésta. La U.P.R., por su parte, alegó que la participación de los profesores-

---

[21] Es importante señalar que la Junta, en el caso de autos, si bien rechazó el concepto de la "autoridad colegiada", utilizó su análisis para excluir a aquellos profesores miembros de los comités de personal de la unidad apropiada porque consideró que sus funciones podían "afectar significativamente el status de empleo o las condiciones de trabajo de otras personas".

senadores en la unión crearía un conflicto de intereses, como el que existe en relación con los profesores excluidos por su participación en los organismos administrativos.

La figura del empleado gerencial se creó en gran medida para evitar conflictos de intereses tanto dentro de la unidad de negociación colectiva, como dentro de los cuerpos administrativos de la institución. La decisión de la Junta excluye de la unidad apropiada a los profesores miembros de la Junta Administrativa y a los profesores miembros de los comités de personal, mientras dichos profesores pertenezcan a estos cuerpos. Tal exclusión se hace para evitar los supuestos conflictos de intereses que tendrían estos profesores que realizan gestiones "patronales" o "administrativas", si a la vez estuviesen en la unión. Si se estima que estos "profesores-administradores" pudiesen tener "conflictos de intereses", también los podrían tener los "profesores-senadores", debido a que por ley éstos también deciden asuntos que afectan las condiciones de trabajo de los profesores. Esencialmente, la situación de unos y otros, por las razones explicadas antes, no son sustancialmente distintas. Por ello, no es sostenible la diferenciación que entre unos y otros hizo la Junta.

En efecto, es cuestionable la utilización del concepto "conflictos de intereses" y el evitarlo para decidir qué profesores deben incluirse y cuáles deben excluirse de una unidad apropiada de negociación colectiva. No se trata de conceptos de aplicación acertada en el contexto universitario. Nótese, por ejemplo, que en el caso de marras se excluyen de la unión o unidad apropiada los profesores que participan directamente en las decisiones administrativas, como lo son los profesores que integran los comités de personal. Pero resulta que dichos profesores han sido *electos* a esos cargos precisamente por los miembros de la unión; unión a la cual ellos mismos también habrían de pertenecer de lleno en algún momento próximo, cuando dejen de ocupar los cargos que ostentan por tiempo

limitado. Esto crea la situación anómala de que aquellos que se consideran por la Junta como parte de la "gerencia" hoy llegaron ahí por mandato electoral de la unión y han de estar integrando la unión mañana. Más aún, es cuestionable que sea realmente efectiva la exclusión de estos profesores de la unión por parte de la Junta, porque dichos profesores son miembros "inactivos" de la unión aun mientras ocupen puestos administrativos, y la única diferencia entre ser un miembro "inactivo" y uno "activo" es que el miembro "inactivo" no tiene derecho al voto en las decisiones tomadas por la unión, mientras que el miembro "activo" sí lo tiene. Pero, igual que los "activos", los miembros "inactivos" pagan cuotas y asisten a las reuniones de la unión. ¿Tiene sentido hablar del concepto de "conflictos de intereses" y de evitarlos en situaciones tan entrecruzadas?

Más a fondo, el problema con el uso aquí del concepto de "conflicto de intereses" se percibe con claridad al recordar que éste tuvo su origen en el campo laboral en épocas pasadas, en las cuales existía una incuestionable polarización antagónica entre los intereses del dueño del capital y los intereses del obrero empleado por ese dueño. Allí, la participación de un obrero en alguna gestión administrativa patronal presentaba con claridad una situación de conflicto de intereses. Esta noción, sin embargo, es de difícil aplicación hoy al campo universitario por razones evidentes. Baste con señalar que el auténtico universitario rara vez representa posiciones encontradas. Cuando es miembro de una Junta Administrativa o del Senado Académico, como cuando es miembro de un comité de personal o de currículo, sus perspectivas son esencialmente las mismas que tiene cuando se desempeña sólo como claustral. Responden o deben reponder a lo que en conciencia le parece ser la mejor opción para la institución a la que pertenece, no como un "asalariado", sino como miembro integrante esencial de ésta. A base del concepto de "conflicto de intereses",

difícilmente puedan hacerse decisiones acertadas y manejables relativas a lo que nos concierne aquí.

■ En conclusión, existe en el esquema universitario una clara *autoridad colegiada* del Claustro. Los profesores miembros del Senado Académico, de los comités de personal y de los otros comités institucionales son todos *electos* por el Claustro. Todos estos profesores que integran las estructuras académicas al nivel de departamento, Facultad o Recinto, a su vez mantienen relaciones profesionales estrechas e íntimas con el Claustro que los elige, tanto por el carácter representativo que ostentan, como porque pertenecen con estos claustrales a una misma comunidad académica. Los propios claustrales son candidatos a ser ellos mismos senadores, o miembros de los comités de personal, de otros comités o de los organismos administrativos en cualquier momento. Existe un vivo entretejido de intensas y frecuentes experiencias compartidas que une a unos y otros. La posición de la Junta sólo tendría sentido si los intereses de la Facultad y los de la U.P.R. como institución fuesen incompatibles. En este caso se da lo contrario. Al menos en cuanto a los asuntos académicos fundamentales se refiere, los intereses claustrales son paralelos a los de la institución. Asumir que los profesores actúan de acuerdo con intereses propios que son contrarios a los de la U.P.R. como institución equivaldría a suponer unas condiciones de antagonismo que no están apoyadas por las determinaciones de la Junta ni por el expediente. Véanse: *NLRB v. Yeshiva University*, supra, pág. 678 esc. 8; G.A. Bodner, *The Implications of the Yeshiva University Decision for Collective Bargaining Rights of Faculty at Private and Public Institutions of Higher Education*, 7 (Núms. 1–2) J.C. & U.L. 78, 88–92 (1980–1981).

C. Lo que aparenta ser la posición central de la Junta es la noción de que las funciones que desempeñan los pro-

fesores en la U.P.R. que pudieran considerarse como "gerenciales" sólo tienen que ver con "aspectos puramente académicos, inherentes a la profesión del magisterio". En esencia, el argumento de la Junta es que la exclusión gerencial no puede aplicarse a los profesores porque éstos, por sus tareas, son realmente "empleados profesionales" que están cubiertos por la Ley. Sin embargo, esta posición de la Junta equivocadamente contrapone la norma del "empleado profesional" a la del "empleado gerencial", en clara contravención de la jurisprudencia que aplica a ambas normas.

 Nuestra Ley no define a los "empleados profesionales". La Junta ha adoptado la definición que provee la ley federal.[22] *Junta de Retiro de Maestros*, Dec. de la J.R.T. Núm. D-768 (1978); *Autoridad de Acueductos y Alcantarillados de Puerto Rico*, Dec. de la J.R.T. Núm. D-510 (1969); *Autoridad de las Fuentes Fluviales de Puerto Rico*, supra. Véase, además, Fernández y Romany, *op. cit.*, págs. 383–384. De acuerdo con esta definición, los profesores serían considerados como "empleados profesionales" porque cumplen con los requisitos normativos básicos: desempeñan una labor de naturaleza intelectual que requiere educación especializada, tienen discreción al desempeñar sus labores y su trabajo no puede ser juzgado a base del tiempo invertido.

 *No obstante, no puede determinarse que un*

---

[22] La ley federal, en lo pertinente, dispone que:

"The term 'professional employee' means—

"(a) any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes; or ...." 29 U.S.C. sec. 152(12).

*empleado es de tipo "profesional" sin antes decidir si debe considerársele como "empleado gerencial".* Estos conceptos fueron desarrollados normativamente para fines distintos. El propósito de la norma que configura al "empleado profesional" es asegurar que, al momento de certificar una unidad apropiada, si están protegidos por la Ley, los "empleados profesionales" serán consultados antes de que se les incluya con "empleados no profesionales" en una misma unidad apropiada. *Junta de Retiro de Maestros, supra.* La norma sobre el "empleado gerencial", en cambio, tiene el propósito de denegar el derecho a unionarse y negociar colectivamente a empleados que tengan carácter gerencial dentro de su institución. Por eso, en casos como el de marras, si se determina que los empleados deben considerarse como "gerenciales", la norma del "empleado profesional" no aplica porque los empleados no tienen derecho a unionarse y negociar colectivamente. Se deniega la certificación de plano y no es necesario entrar a decidir si son "profesionales" o no.

A través de sus decisiones previas, la Junta había aplicado estas normas de manera compatible con la jurisprudencia federal. Así, en numerosas ocasiones la Junta denegó el derecho a unionarse y negociar colectivamente a "profesionales" que consideró como "gerenciales". A manera de ejemplos, véanse: *Fondo del Seguro del Estado*, supra; *Autoridad de Fuentes Fluviales de Puerto Rico*, supra. En el caso de marras, sin embargo, la Junta mezcló de forma impropia los criterios de ambas normas y determinó que las funciones "gerenciales" de los profesores no justificaban que se les excluyese de la unidad apropiada porque dichas funciones respondían únicamente a sus conocimientos especializados y no a la política gerencial y, en la alternativa, que las funciones gerenciales de los profesores no sobrepasaban las funciones profesionales. Este manejo enredado de los conceptos normativos en cuestión no tiene fundamento ni precedente en la jurisprudencia aplicable.

El caso *NLRB v. Yeshiva University*, supra, no afectó las doctrinas federales sobre el "empleado gerencial" y el "empleado profesional" según habían sido adoptadas por la Junta anterior al caso de marras. En *NLRB v. Yeshiva University*, supra, el Tribunal Supremo federal fijó el criterio que gobierna la aplicación al contexto universitario de la normativa sobre el "empleado gerencial". Este criterio es en cuanto a que en las universidades regidas por una estructura "madura",(23) la participación de los profesores en los organismos institucionales es de tal naturaleza que, de darse en el contexto industrial, sería considerada gerencial. En estos casos, los profesores serán considerados como "empleados gerenciales" y serán excluidos de toda unidad apropiada, independientemente de si son o no "empleados profesionales". De lo contrario, se menoscabarían los esfuerzos de la universidad de crear una estructura organizativa-administrativa de cooperación y comunidad, esencial para la calidad de la vida universitaria. Véase Nota, *The Managerial Status of Faculty Members Under the N.L.R.A.*, 94 Harv. L. Rev. 75, 251, 255–256 (1980).

En conclusión, no encontramos fundamento alguno en el caso ante nos que justifique apartarse de los criterios normativos que surgen con claridad de la jurisprudencia local y federal antes citada. La Junta estaba obligada a considerar integralmente la posición de los profesores dentro del esquema universitario para determinar si éstos eran "empleados gerenciales", independientemente de si eran "empleados profesionales" o no.

## VII

En resumen, pues, para los fines de esta opinión, los miembros del Claustro del Recinto de Río Piedras de la

---

(23) Una estructura universitaria "madura" es aquella en la que la administración está dividida entre un cuerpo central y uno o más cuerpos colegiados. *NLRB v. Yeshiva University*, supra, pág. 680.

U.P.R. pueden dividirse en dos grandes grupos. Por un lado están los claustrales que deben considerarse "empleados gerenciales" por las funciones que desempeñan directamente en la administración de la institución, en la formulación de normas que rigen aspectos importantes del quehacer universitario o en la implantación de dichas normas. Se trata de un enorme grupo de profesores que: (a) ocupan cargos de Rectores, Decanos, Decanos asociados o auxiliares, directores de departamentos y directores asociados o auxiliares; (b) son miembros de organismos centrales de la institución, como lo son la Junta Universitaria, la Junta Administrativa y el Senado Académico, o (c) integran los importantes comités de las facultades y departamentos. Se trata de cientos de profesores, muchos de los cuales aun la Junta estimó que debían excluirse de la unidad apropiada. Todos estos profesores forman parte de un grupo que, sin lugar a dudas, tiene un impacto real y significativo en la dirección del quehacer universitario.

El otro gran grupo claustral lo constituyen el resto de los profesores del Recinto que, en un momento determinado, no ocupan cargos administrativos ni son miembros de los organismos centrales o de los importantes comités de la institución. Estos otros profesores, sin embargo, también deben considerarse gerenciales, según la acepción particular de este concepto en el contexto universitario, por la relación íntima y estrecha que guardan con el grupo anterior, a través de la cual hacen sentir de modo efectivo sus criterios sobre cómo debe conducirse el quehacer universitario. En gran medida, este segundo grupo determina mediante el voto cuáles claustrales pertenecerán al primer grupo. Además, a través de su participación en las reuniones claustrales a todos los niveles, este segundo grupo formula recomendaciones y directrices efectivamente al primero. También lo hace a través de los hondos, numerosos y frecuentes contactos que este segundo grupo tiene con el primero, en función de su común participación

en la comunidad académica que juntos constituyen. Finalmente, los miembros de este segundo grupo pueden pasar a formar parte, en cualquier momento, del primer grupo y *viceversa*, por la naturaleza temporalmente limitada, casi rotativa, de los cargos y encomiendas académicas.

No existe entre el primer y segundo grupo la *diferenciación en funciones, autoridad, identidad e intereses* que existe en el modelo industrial entre el patrono y el obrero. Prevalece, más bien, una *esencial consustancialidad* entre uno y otro grupo que impide que puedan hacerse distinciones fundamentales entre ellos en cuanto a cuáles deben considerarse "empleados gerenciales" de la U.P.R. y cuáles no. En efecto, ambos son partes integrantes de un régimen de autoridad colegiada.

Sobre uno y otro grupo juntos, a través de sus respectivos y complementarios quehaceres universitarios, recae principalmente la conducción y el manejo de los asuntos universitarios más importantes, ciertamente de los académicos. Frente a su *decisiva* gestión colegiada palidece la autoridad real del ente que ocupa la posición de suprema jerarquía, bien sea el Consejo de Educación Superior o la Junta de Síndicos. No tiene sentido jurídico real el que se les considere a aquéllos como "empleados" y a éstos como "patrono", como tampoco tiene sentido jurídico pretender equiparar a los claustrales con los trabajadores de oficina, de mantenimiento o de seguridad de la institución, que escasamente ejercen discreción alguna en la dirección de la UPR.

■ Resolvemos, pues, que todos los profesores del Recinto de Río Piedras de la U.P.R. son "empleados gerenciales", ya por ser miembros del Claustro, por ser parte de un régimen de autoridad colegiada y por su participación, sea ésta directa o representativa, en los organismos departamentales, de Facultad y a nivel institucional de la U.P.R., en especial la Junta Administrativa, el Senado Académico y los comités de personal y demás comités perma-

nentes de las Facultades. Como tales no les cobija el régimen de la negociación colectiva.

## VIII

Ya que resolvemos que los profesores son "empleados gerenciales" y por lo tanto no tienen derecho a unionarse y a negociar colectivamente, resulta innecesario, para los fines del caso ante nos, resolver la importante cuestión jurídica de si la U.P.R. es o no un *patrono* para efectos de la Ley y de la Constitución. Evidentemente, resolver tal asunto podría tener implicaciones serias más allá de los confines de este caso. Podría afectar, por ejemplo, a otros empleados de la U.P.R. que jurídicamente estén protegidos, dependiendo ello únicamente del *status* de la U.P.R. como patrono. Como esos empleados no están ante nos ahora, no debemos anticipar una decisión prematuramente. Dejamos el asunto pendiente para decidirlo de presentarse en alguna otra ocasión.

Sin embargo, es menester hacer constar que, en el caso de autos, existen consideraciones de orden público que le dan apoyo a las conclusiones previamente formuladas en esta opinión. Dichas consideraciones son parte de los criterios para determinar si una agencia de gobierno es o no "patrono" para efectos de la Sec. 18 del Art. II de la Constitución, L.P.R.A., Tomo 1.[24] Mencionamos dos de estas

---

[24] El término "patrono" de la Ley excluye al Gobierno de Puerto Rico, sus subdivisiones y algunas instrumentalidades corporativas gubernamentales. 29 L.P.R.A. sec. 63(2). Las instrumentalidades corporativas gubernamentales *incluidas* son:

"... La Autoridad de Tierras, la Compañía Agrícola, el Banco de Fomento, la Autoridad de Energía Eléctrica, la Compañía de Fomento Industrial de Puerto Rico, la Autoridad de los Puertos, la Autoridad de Comunicaciones, y las subsidiarias de tales corporaciones, e incluirá también las empresas similares que se establezcan en el futuro y sus subsidiarias, *y aquellas otras agencias del Gobierno que se dediquen o puedan dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario.*" (Énfasis suplido.) 29 L.P.R.A. sec. 63(11).

La Constitución, a su vez, incluye a aquellas instrumentalidades corporativas gubernamentales que "funcionen como empresas o negocios privados". Art. II, Sec.

consideraciones de orden público, no para resolver ahora si la U.P.R. es patrono o no, sino para complementar el análisis previamente expuesto. *Estas consideraciones permiten ver, con mayor claridad, cuán esencialmente distinta es la relación de la U.P.R. con sus profesores de la relación obrero-patronal que se considera de ordinario en la Ley* y en la jurisprudencia aplicable, siendo esta diferencia esencial el fundamento medular de esta opinión.

La primera de estas consideraciones de orden público tiene que ver con la situación financiera de la U.P.R. La Junta determinó que la U.P.R. es un patrono en parte porque, según la Junta, tiene *"clara autonomía fiscal"*. La Junta apoyó su conclusión sobre que la U.P.R. aprueba su propio presupuesto y sistemas de contabilidad y auditoría; puede disponer de los fondos siempre y cuando sea de manera compatible con la Ley de la Universidad de Puerto Rico, 18 L.P.R.A. sec. 601 *et seq.*, y puede adquirir deudas y obligaciones que no serán consideradas como pertenecientes al Estado Libre Asociado, 18 L.P.R.A. sec. 612(d) y (f). Se trata de un análisis superficial de la Junta, que erró en no concederle mayor peso a las *limitaciones* que tiene la U.P.R. en este aspecto.

En el contexto clásico, las empresas que operan con fi-

---

18, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 330.

En el caso *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976), tuvimos ocasión de enumerar una serie de criterios que, en conjunto, sirven para determinar si una instrumentalidad del Gobierno funciona o no como una empresa o negocio *privado* de manera tal que pueda ser considerada como un "patrono" a los fines de la Constitución. Estos criterios son, entre otros:

"... si los empleados de la agencia concernida están cubiertos por la Ley de Personal del Estado Libre Asociado; si los servicios prestados por la agencia, por su naturaleza intrínseca, nunca han sido prestados por la empresa privada; si la agencia está capacitada para funcionar como una empresa o negocio privado; si la agencia de hecho funciona como una agencia o negocio privado; el grado de autonomía fiscal de que disfrute la agencia; el grado de autonomía administrativa de que goce; si se cobra o no un precio o tarifas por el servicio rendido (precio que debe ser básicamente equivalente al valor del servicio); si los poderes y facultades concedidos en la ley orgánica de la agencia la asemejan fundamentalmente a una empresa privada; y si la agencia tiene o no la capacidad para dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario." *A.A.A. v. Unión Empleados A.A.A.*, supra, pág. 455.

nes de lucro perciben ganancias que provienen de su capacidad de vender sus productos a precios que sobrepasan sus costos. Bajo este esquema, las decisiones gerenciales de la empresa tienen un impacto directo sobre sus ingresos, ya sea mediante el control de los costos o el aumento de los precios. *Este esquema no se da ni puede darse en la U.P.R.* De las propias determinaciones de la Junta se desprende que *alrededor del ochenta y seis por ciento (86%) del presupuesto de la Universidad proviene del Fondo General del Estado Libre Asociado. Ese porcentaje responde a una fórmula establecida por ley sobre la cual la U.P.R. no tiene control.* Esta fórmula ha aumentado muy poco desde su adopción en 1966, y comenzando con el Año Fiscal 1994 equivale

> ... al nueve por ciento y treinta tres centésimas del uno por ciento (9.33%) del promedio del monto total de las rentas anuales obtenidas de acuerdo con las disposiciones de las Leyes del Estado Libre Asociado de Puerto Rico e ingresados al Fondo General del Tesoro Estatal en los dos (2) años económicos inmediatamente anteriores al año económico corriente y de lo ingresado en cualesquiera fondos especiales creados mediante legislación a partir del 1ro. de julio de 1993, que se nutran de recursos generados por imposiciones contributivas. 18 L.P.R.A. sec. 621–1.

La Junta concluyó que el hecho de que la mayor parte de los fondos de la U.P.R. provienen de una aportación gubernamental fija no es un impedimento para que ésta sea considerada como "patrono" porque, según la Junta, existen servicios que la U.P.R. cobra y otros que *podría cobrar.*

Entre los servicios que la U.P.R. cobra al presente, según la Junta, están: las residencias de estudiantes y de profesores, la cafetería y el comedor, la librería, las funciones de teatro, los servicios médicos, los derechos de copias y la venta de plantas, animales y frutas en el Servicio de Extensión Agrícola. El peso que le dió la Junta a estos servicios es claramente exagerado. Estos servicios representan, entre todos, sólo un bajísimo porcentaje de los ingresos

de la U.P.R. en comparación con los fondos gubernamentales. Más aún, son servicios meramente incidentales al servicio principal que provee la institución, que afectan directamente en la mayoría de los casos los bolsillos de los estudiantes, los profesores y los trabajadores de la institución. En el frágil ambiente de la U.P.R. es difícil concebir que para aumentar los sueldos de los profesores, digamos, se aumenten los precios de la cafetería y de la librería. A través de estos servicios, *es muy poco probable que la U.P.R. pueda aumentar sus ingresos de manera significativa.*

La Junta alegó, además, que existen otros servicios que la U.P.R. "podría" cobrar para aumentar sus ingresos. Entre estos servicios, la Junta sólo mencionó uno: el estacionamiento. Este servicio *en la actualidad se ofrece gratuitamente* a los estudiantes, a los profesores y al público en general. El argumento de la Junta es que la U.P.R. podría cobrar por el estacionamiento con mucho éxito porque es un servicio esencial. La Junta erró en no concederle mayor peso al hecho de que el estacionamiento se ha ofrecido tradicionalmente como un servicio gratuito y a lo difícil que sería convertirlo en una fuente de ganancias para la U.P.R. En otro contexto, examinamos los intereses de la U.P.R. al ofrecer este servicio con el propósito de resolver si ésta era responsable o no por el hurto de vehículos de sus áreas de estacionamiento. En aquella ocasión resolvimos que la U.P.R. no era responsable por no operar el estacionamiento con ánimo directo de lucro. Así lo expresamos:

> No se cuestiona la naturaleza y propósitos de la Universidad de Puerto Rico. Es una corporación pública, de génesis legislativa, encargada de la educación superior en Puerto Rico. ... Como universidad del Estado tiene una "obligación de servicio al Pueblo de Puerto Rico". Económicamente funciona con fondos gubernamentales. ... *Sus estudiantes sólo cubren una ínfima parte del costo pagando una cantidad limitada por concepto de matrícula. La universidad no opera con ánimo directo ni indirecto de lucro. Siempre ha considerado sus áreas de es-*

*tacionamiento como una facilidad gratuita al estudiante de carácter privilegiado.* (Énfasis suplido.) *Sepúlveda v. U.P.R.*, 115 D.P.R. 526, 527 (1984).

Por otro lado, la Junta determinó que el hecho de que la U.P.R. opera con costos de matrícula muy bajos no es un factor determinante y resolvió que como la U.P.R. ofrece servicios similares a los que ofrecen las universidades privadas, la U.P.R. *"podría cobrar más, tanto como fuera necesario,* y a la luz de lo establecido constitucionalmente, *para ser autosuficiente".* (Énfasis suplido.) Esta conclusión nos parece desacertada. Por razones evidentes, aumentar los costos de matrícula tan sustancialmente levantaría gravísimos problemas relativos al papel que juega la U.P.R. en la sociedad puertorriqueña, para no mencionar los relativos a su implantación. Un aumento como el que sugiere la Junta, *lo suficientemente alto como para convertir a la U.P.R. en una operación de carácter lucrativo*, ocasionaría graves problemas, por ejemplo, respecto al estudiantado. Afectaría tanto la capacidad de nuestros jóvenes para obtener una educación superior de buena calidad como la capacidad de la U.P.R. para cumplir su misión estatutaria de desarrollar la riqueza intelectual y espiritual de nuestro pueblo, "especialmente los menos favorecidos en recursos económicos". 18 L.P.R.A. sec. 601(b)(4).

La Junta, al analizar este asunto, no encaró propiamente la realidad de la U.P.R. Su juicio de que la U.P.R. goza de autonomía fiscal es superficial, no sólo porque no atiende adecuadamente las enormes dificultades que la institución ha encarado históricamente para allegarse fondos sino, además, porque no toma en cuenta que *la mayor parte de su presupuesto se dedica precisamente al pago de salarios.* Actualmente, el Recinto de Río Piedras utiliza el 84.76% del total de su presupuesto para el pago de salarios, aportaciones patronales y demás compensaciones.[25]

---

[25] Oficina del Rector, Recinto de Río Piedras, 30 de marzo de 1994.

Privada de medios propios suficientes para generar ingresos y cargada por una enorme responsabilidad salarial fija, la U.P.R. no tiene ni remotamente el espacio que tienen las empresas privadas para manipular los elementos de "costos y ganancias" de modo que pueda encarar con éxito los reclamos que inevitablemente surgen de la negociación colectiva. La Junta debió cuestionarse con criterios de realidad si una institución atribulada, como lo es la U.P.R., puede sobrevivir exitosamente la experiencia de la negociación colectiva, cuando tiene muy poco control sobre sus ingresos principales y sus costos principales. No lo hizo, y su falla en este sentido sólo ha servido para crear falsas expectativas sobre el asunto.

La subyacente pretensión de que el Recinto de Río Piedras de la U.P.R. pueda cambiar su funcionamiento actual, para operar como una empresa privada y dedicarse a negocios lucrativos, aparte de ser ilusoria, revela además una crasa ignorancia de lo que es una universidad del Estado y de lo que representa, y ha representado, ese Recinto en la historia del país. Nos negamos a convalidar esta monstruosa distorsión de los esquemas jurídicos y de las realidades puertorriqueñas.

La otra consideración de orden público tiene que ver con ciertas características particulares del Claustro de la U.P.R., aparte de las pertinentes al análisis de los "empleados gerenciales" que distingue la condición de los profesores de la U.P.R. de la de los trabajadores de una empresa privada, como los considerados tradicionalmente por las leyes de relaciones obrero-patronales.

■ En primer lugar, la tarea docente de los profesores no es de modo alguno comparable a la de un trabajador que produce un bien que se va a vender, ni está sujeta al mismo de tipo de presiones y exigencias.

Los profesores gozan de unas libertades de cátedra y de investigación que no tienen paralelo en la condición del

obrero industrial ordinario. El Reglamento General de la U.P.R., en su Sec. 11, dispone:

> *Sección 11.1—Libertad de Cátedra*
> La libertad de cátedra consiste en el derecho de todo miembro del personal docente a enseñar con objetividad y honradez la materia que profesa, *sin otras restricciones que las que le imponen la responsabilidad intelectual y moral de cubrir todos los elementos esenciales del curso,* según aprobados por la autoridad correspondiente, el respeto al criterio discrepante y el deber de impartir sus conocimientos mediante procedimientos pedagógicos identificados con la ética de enseñanza y la búsqueda de la verdad.
>
> *Sección 11.2—Libertad de investigación*
> La libertad de investigación consiste en el derecho de todo miembro del personal docente dedicado a trabajo de investigación a realizar su labor *libre de restricciones que limiten la objetividad, la honradez intelectual o la dedicación a la búsqueda de la verdad en su trabajo.* (Énfasis suplido.) Reg. Gen. U.P.R., pág. 7.

■ Además, los profesores adquieren por ley *permanencia* al cabo de cinco años consecutivos de estar laborando dentro del sistema universitario. 18 L.P.R.A. sec. 613(b); Reg. Gen. U.P.R., Sec. 50.3. A diferencia de las posiciones administrativas más altas, el derecho de permanencia claustral tiene carácter institucional efectivo en todo el sistema universitario, independientemente de la autoridad nominadora que lo otorgue. Reg. Gen. U.P.R., Sec. 50.6. Una vez que un profesor adquiere permanencia, su remoción se puede hacer únicamente mediante la previa formulación de cargos y oportunidad de defensa. 18 L.P.R.A. sec. 613(c). *Esta protección estatutaria que disfrutan los profesores no tiene par en las empresas privadas* y se parece, más bien, al régimen de personal que protege a la generalidad de los empleados gubernamentales. Bajo la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. secs. 183–185m), los patronos privados pueden despedir a un empleado sin previa determinación de justa causa sin más responsabilidad que la del pago, además del sueldo devengado, de una cantidad equivalente al sueldo correspon-

diente a un mes, más una indemnización adicional. No existe una disposición análoga a ésta ni en la Ley de la Universidad de Puerto Rico ni en el Reglamento General de la U.P.R. Ninguna persona puede despedir a un profesor permanente unilateralmente, sin más. Ni el Presidente, ni los Rectores ni los Decanos de la U.P.R. gozan de este tipo de continuidad y seguridad de empleo, lo que ha resultado en *que la mayor parte del Claustro tenga una relación más antigua y estrecha con la institución que las personas que ocupan posiciones más altas dentro de la jerarquía administrativa.*

Anteriormente resolvimos, en un caso relativo a los procesos administrativos de la U.P.R., que ésta, como universidad del Estado, merece deferencia al establecer los criterios de competencia que afectan a su personal docente, dibido a que *necesita cumplir con su misión educativa libre de presiones ajenas y en vista de que "[l]a cuestión es generalmente objeto de extensa reglamentación interna y evaluación por parte de un profesorado con conocimiento especializado y de vasta experiencia".* (Énfasis suplido.) *García Cabán v. U.P.R.*, 120 D.P.R. 167, 179 (1987). Esa posición de hace unos años adquiere ahora especial pertinencia. No creemos que el régimen de la negociación colectiva para profesores sea realmente afín a una institución universitaria como lo es la U.P.R. Ciertamente, desde el punto de vista jurídico y según las normas vigentes, no le es aplicable.

## IX

Por los fundamentos antes expuestos, *se revoca la decisión y orden de elecciones emitida por la Junta.*

Los Jueces Asociados Señores Negrón García y Rebollo López emitieron unas opiniones disidentes. El Juez Asociado Señor Hernández Denton disintió con opinión escrita, a la cual se unió el Juez Asociado Señor Rebollo López.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

Decía Maritain que el "rechazo de lo injusto me da la idea de lo justo".

En lo *procesal*, basta reiterar nuestro criterio de falta de jurisdicción consignado *originalmente* como *único disidente* en la resolución que se expidió de este recurso hace tres (3) años. *Ante el excepcional acuerdo mayoritario asumiéndola*, bajo la ingeniosa pero frágil tesis de las "circunstancias especiales" (opinión mayoritaria, pág. 350), *insistir y abundar sería un ejercicio fútil e inconsecuente*, carente de valor adjudicativo *en esta etapa*, que sólo serviría como obstáculo para plasmar nuestro "rechazo de lo injusto". Liberado así de esa *atadura técnica*, en lo sustantivo exponemos nuestra conciencia judicial de que los profesores de la Universidad de Puerto Rico (en adelante U.P.R.) *tienen derecho a organizarse y a negociar colectivamente*.

I

La negativa mayoritaria choca con el Art. II, Sec. 17 de la Carta de Derechos de nuestra Constitución, L.P.R.A., Tomo 1, que —*distinto* a la federal— lo garantiza expresamente.(¹)

La U.P.R. cumple esencialmente con los criterios jurisprudenciales sobre la instrumentalidad gubernamental que funciona como empresa privada. Véanse: *J.R.T. v. Asoc. Servs. Médicos Hosp.*, 115 D.P.R. 360 (1984); *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976); *Junta Rel.*

---

(¹) En lo pertinente, dispone:

"Los trabajadores de empresas, negocios y patronos privados *y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados* tendrán en sus relaciones directas con sus propios patronos, el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar." (Énfasis suplido.) Art. II, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 329.

*Trabajo v. Club Deportivo*, 84 D.P.R. 515 (1962); *Junta Rel. Trabajo v. Junta del Muelle*, 71 D.P.R. 154 (1950).[2] No desempeña funciones intrínsecas de gobierno; el interés, el orden y la seguridad públicos no lo impiden. Expongamos esos extremos.

Su ley habilitadora le autoriza a demandar y ser demandada; adquirir, poseer, custodiar y administrar todos sus bienes muebles e inmuebles, e hipotecarlos, venderlos o, en cualquier forma, enajenarlos; contraer deudas; celebrar contratos; administrar e invertir sus fondos en forma compatible con sus fines y propósitos, y aceptar y administrar donaciones, herencias y legados. 18 L.P.R.A. sec. 297a.

La Sec. 5 de la Ley Núm. 49 de 7 de junio de 1977 (3 L.P.R.A. sec. 1338(5)) *excluyó* su personal de la Ley de Personal del Servicio Público de Puerto Rico, Ley Núm. 5 de 14 de octubre de 1975 (3 L.P.R.A. sec. 1301 *et seq.*).

La U.P.R. brinda, al igual que el sector privado, servicios de educación superior, pero no está obligada a hacerlo gratuitamente. Const. E.L.A., *supra*, Sec. 5. El que tradi-

---

[2] Estos criterios fueron esbozados así en *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437, 455–456 (1976):

"...si los empleados de la agencia concernida están cubiertos por la Ley de Personal del Estado Libre Asociado; si los servicios prestados por la agencia, por su naturaleza intrínseca, nunca han sido prestados por la empresa privada; si la agencia está capacitada para funcionar como una empresa o negocio privado; si la agencia de hecho funciona como una empresa o negocio privado; el grado de autonomía fiscal de que disfrute la agencia; el grado de autonomía administrativa de que goce; si se cobra o no un precio o tarifas por el servicio rendido (precio que debe ser básicamente equivalente al valor del servicio); si los poderes y facultades concedidos en la ley orgánica de la agencia la asemejan fundamentalmente a una empresa privada; y si la agencia tiene o no la capacidad para dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario. A estos criterios pueden añadirse otros, sin pretender agotar la lista: la estructura en sí de la entidad; la facultad de la agencia para demandar y ser demandada ilimitadamente; el poder de obtener fondos propios en el mercado general de valores a base de su récord económico y sin empeñar el crédito del Estado Libre Asociado; la facultad de adquirir y administrar propiedades sin la intervención del Estado; el punto hasta donde el reconocimiento a los trabajadores de la agencia de los derechos a que se refiere el primer párrafo de la Sec. 18 concuerda o no con el esquema constitucional."

Ninguno es determinante por sí sólo. Véase, además, *Morales González v. J.R.T.*, 121 D.P.R. 249, 260 (1988).

cionalmente cobre tarifas bajas no la excluye como entidad generadora de ingresos, pues el criterio determinante es "si la agencia tiene o no la *capacidad* para dedicarse *en el futuro* a negocios lucrativos o actividades que tengan por objeto un beneficio pecuniario". (Énfasis suplido.) *A.A.A. v. Unión Empleados A.A.A.*, supra, pág. 455.

Recalcamos que "[e]l hecho de que debido a tarifas bajas o a otras razones las demandadas generalmente han perdido dinero en sus operaciones, no afecta la cuestión de si están o no cubiertas por la Ley. Lo importante es si su autoridad o la naturaleza de los servicios por ellas rendidas las capacitan, si así lo desean, a operar en forma comparable a entidades privadas que pueden dedicarse al mismo negocio". *Junta Rel. Trabajo v. Junta del Muelle*, supra, págs. 159–160, reiterado en *J.R.T. v. Junta Adm. Muelle Mun. de Ponce*, 122 D.P.R. 318, 326–327 (1988).

Su propia ley orgánica propende que se involucre en actividades lucrativas de diversas índoles.(³)

No se cuestiona *su alto grado de autonomía fiscal y administrativa*. Acertadamente, la Junta de Relaciones del Trabajo concluyó que, a través del Consejo de Educación Superior,(⁴) la U.P.R.:

> ... considera y aprueba el proyecto de presupuesto del sistema universitario, el que somete su Presidente; asimismo, aprueba su propio sistema de contabilidad y auditoría para revisar el

---

(³) "(b) La Universidad podrá aprobar, imponer, revisar de tiempo en tiempo y cobrar derechos, tarifas, rentas y otros cargos sobre el derecho al uso u ocupación de cualesquiera facilidades, propiedad de o administradas por la Universidad o por cualquier servicio, derecho o privilegio provisto por cualesquiera dichas facilidades o por la Universidad, incluyendo, pero sin que se entienda esto como una limitación, derechos de matrícula, derechos de estudiantes y otros derechos, rentas, cargos, derechos de laboratorio, de rotura, libros, suministros, dormitorios, casas y otras facilidades de vivienda, restaurantes y sus facilidades, aparcamiento para vehículos, facilidades provistas por centros de estudiantes, eventos y actividades, y otros servicios." Art. 13(b) de la Ley de la Universidad de Puerto Rico, 18 L.P.R.A. sec. 612.

(⁴) A partir de la Ley Núm. 16 de 16 de junio de 1993 (18 L.P.R.A. sec. 602), la facultad del Consejo de Educación fue traspasada a la Junta de Síndicos.

Asumimos la constitucionalidad de esa legislación conforme nuestro voto disidente emitido el pasado 24 de septiembre de 1993 en *C.E.S. v. Gobernador I*, 134 D.P.R. 350 (1993).

uso de los fondos, conforme a la Ley y los reglamentos. Tiene el poder para invertir sus fondos en forma compatible con los fines y propósitos de la Ley Universitaria; igualmente, tiene la custodia, gobierno y administración de todos sus fondos, (18 L.P.R.A. sec. 502(e)(f)); está autorizada a tomar dinero en calidad de préstamo para cualesquiera de sus fines y actividades; y, naturalmente, para emitir bonos, pagarés y otras obligaciones. Finalmente, las deudas y obligaciones de la Universidad no son consideradas deudas y obligaciones del Estado Libre Asociado, ni de sus municipios, ni subdivisión política alguna de aquél, y, ninguna de esas entidades será responsable de las mismas, (18 L.P.R.A. sec. 612(d)(f)). La Universidad de Puerto Rico tiene una clara autonomía fiscal. Decisión y orden de elecciones, pág. 18.

Y en lo administrativo, dictaminó:

... [E]l Consejo de Educación Superior ... cuenta con facultades académicas para ayudarle en la formulación de las directrices que regirán la orientación y desarrollo de la Institución; para examinar y aprobar las normas generales de funcionamiento propuestas por los organismos legislativos y administrativos de la misma; y, para supervisar la marcha u operación de la institución, (18 L.P.R.A. sec. 602(d)). Entre los deberes y atribuciones de ésta, y, específicamente, los del Consejo de Educación Superior están los siguientes: la aprobación del plan de desarrollo integral y de revisión anual; la autorización para la creación, modificación y reorganización de recintos, centros y otras unidades institucionales universitarias, colegios, escuelas, facultades, departamentos y dependencias; con la excepción hecha de la atribución para abolir las unidades institucionales autónomas creadas por la Ley Universitaria, ni por la del Colegio Regional que ya existía para 1966; y la creación y eliminación de los cargos de los funcionarios auxiliares a su Presidente. Decisión y orden de elecciones, pág. 19.

No albergamos dudas de que la U.P.R. es un "patrono" para efectos de nuestras leyes laborales. Como corolario, sus profesores están cobijados bajo el palio protector de la cláusula constitucional obrera.

## II

No obstante, la mayoría del Tribunal resuelve que son gerenciales. Se fundan en *NLRB v. Yeshiva University*, 444 U.S. 672 (1980), que decidió que los miembros de *esa facultad* eran empleados gerenciales excluidos de la Ley de Relaciones del Trabajo *federal*, pues participaban activamente en la formulación de la política administrativa de esa Universidad. *Es un error. NLRB v. Yeshiva University*, supra, no es de aplicación mandatoria y, además, es distinguible. Veamos.

*Primero*, el más Alto Foro federal expresó que su decisión no pretendía abarcar todas las instituciones universitarias.

> Reconocemos que éste es apenas el punto de partida, y que otros factores, no presentes aquí, podrían formar parte del análisis *en otros contextos*. Es claro, por ejemplo, que los profesores no podrían ser excluidos meramente porque determinen el contenido de sus cursos, evalúen sus estudiantes y supervisen sus investigaciones. Podría haber instituciones de educación avanzada distintas a Yeshiva donde la facultad fuera *entera o predominantemente no gerencial*. Podría haber también miembros de la facultad en Yeshiva y en universidades similares que propiamente pudieran ser incluidos en una unidad de negociación. Pudiera trazarse una línea racional entre miembros de facultad con o sin permanencia, *dependiendo de cómo se estructura y opera una facultad*. Pero no expresamos opinión en cuanto a estas interrogantes porque resulta claro que la unidad aprobada por la Junta era demasiado amplia. (Traducción y énfasis nuestros.) *NLRB v. Yeshiva University*, supra, págs. 690–691 esc. 31.

*Segundo*, a tono con esa nota cautelar, el alcance decisorio de *NLRB v. Yeshiva University*, supra, ha sido restringido ante configuraciones institucionales universitarias distintas. *David Wolcott Kendall Memorial School v. N.L.R.B.*, 866 F.2d 157 (6to Cir. 1989); *Loretto Heights College v. N.L.R.B.*, 742 F.2d 1245 (10mo Cir. 1984); *N.L.R.B. v. Cooper Un. for Advancement of Science*, 783 F.2d 29, 31–32 (2do Cir.), *cert.* denegado, 479 U.S. 815 (1986); P.S.

Bryant, *Hybrid Employees: Defining and Protecting Employees Excluded from the Coverage of the National Labor Relations Act*, 41 Vand. L. Rev. 601 (1988); D.M. Rabban, *Distinguishing Excluded Managers from Covered Professionals under the NLRA*, 89 Colum. L. Rev. 1775 (1989); Comentarios, *Industrial Democracy and the Managerial Employee Exception to the National Labor Relations Act*, 133 U. Pa. L. Rev. 441 (1985).

*Tercero*, curiosamente, según la ley *federal* aplicada en *NLRB v. Yeshiva University*, supra, las universidades públicas —*como la U.P.R.*— por ser propiedad del Estado *no* son "patronos" sujetos a sus disposiciones. 29 U.S.C. sec. 152(2).

*Cuarto*, el poder decisorio administrativo de la facultad en la Universidad *privada* de Yeshiva, de peculiar raigambre judaica, era distinto al de los profesores de la U.P.R. Allí los profesores a tiempo completo asistían *activa y realmente* a la administración en la formulación del currículo, el sistema de calificación, los parámetros de admisión y matrícula y el calendario académico. Además, hacían recomendaciones sobre la contratación, los despidos y los ascensos de profesores, así como en torno a la concesión de sabáticas y permanencias. *La evidencia presentada en NLRB v. Yeshiva University*, supra, *demostró que la gran mayoría de estas recomendaciones eran acogidas.*(5) Por ello se concluyó que la facultad de Yeshiva era la que, en

---

(5) Allí se consignó:

"Por ejemplo, los Decanos de Yeshiva y Erna Michael conceptúan vinculadoras las actuaciones de la facultad. *Íd.*, págs. 248–249, 312–313. Los administradores testificaron que ninguna iniciativa académica de ninguna de las facultades había sido vetada, por lo menos desde 1968. *Íd.*, págs. 250, 313. Cuando la facultad de Stern College estuvo en desacuerdo con la decisión del Decano de eliminarse la concentración en educación, ésta fue restituida. *Íd.*, pág. 191. El Director del Instituto de Maestros para Mujeres testificó que 'la facultad es la escuela', *íd.*, pág. 379, mientras que el Director de James Strian School describió su posición como 'el brazo ejecutivo de la facultad', quienes lo habían revocado en ocasiones, *íd.*, págs. 360–361. Todas las decisiones relacionadas con materias académicas en el Programa de Yeshiva y de Bernard Revel se hacen mediante el consenso de la facultad. *Íd.*, págs. 574, 583–586. La 'operación interna de [Wurzweiler] ha sido sustancialmente gobernada por las decisiones de la facultad', de acuerdo a su Decano. *Íd.*, pág. 502.

efecto, *operaba de forma sustancial la Universidad. NLRB v. Yeshiva University*, supra, pág. 691. ¿Puede decirse lo mismo de la U.P.R.?

Ciertamente hay que reconocer que *la injerencia de los profesores de la U.P.R. en estos asuntos dista mucho de ser análoga.* Como atinadamente nos señala la Junta de Relaciones del Trabajo, en la U.P.R. la participación profesoral en la toma de decisiones, aunque existe, *es de naturaleza meramente consultiva, no gerencial.* La Junta de Síndicos es el cuerpo rector, cuyos integrantes son nombrados por el Gobernador con el consejo y consentimiento del Senado. A su vez, ésta nombra al Presidente de la Universidad. Además, sólo la Junta de Síndicos crea, modifica o reorganiza las dependencias universitarias.

En la U.P.R. las funciones esencialmente administrativas, por disposición legal y reglamentaria, han sido asignadas a los organismos que correctamente *excluyó* la Junta de Relaciones del Trabajo de la unidad apropiada de negociación colectiva. A tal efecto, el poder de nombramiento de los Decanos recae *exclusivamente* en los Rectores, luego de consultar a la facultad, notificando al Presidente y a la Junta de Síndicos. 18 L.P.R.A. sec. 606(5); Reglamento General de la Universidad de Puerto Rico, Consejo de Educa-

---

"Un decano estimó que el 98% de las recomendaciones de la facultad sobre nombramientos eran acogidas. *Ibid.* Otros no pudieron recordar ninguna ocasión, en la cual una recomendación de la facultad hubiese sido revocada. *Ibid,* págs. 193–194. En el Stern College, el Decano en seis (6) años no había revocado una decisión sobre ascensos. *Íd.,* págs. 193–194. El Presidente ha aceptado *todas* las decisiones de la facultad de Yeshiva College sobre ascensos y sabáticas, incluyendo decisiones opuestas a las del Decano. *Íd.,* págs. 268–270. En Erna Michael, el Decano *nunca* ha contratado a un miembro de la facultad a tiempo completo sin el consentimiento del profesor de mayor jerarquía afectado, *íd.,* págs. 333–335, y el Director del Instituto de Maestros para Mujeres señaló categóricamente [baldly] que nunca había sido contratado un profesor si 'existía la más mínima objeción hasta de un solo miembro de la facultad'. *Íd.,* pág. 388. La facultad, en ambas escuelas, ha revocado recomendaciones hechas por los decanos. Ningún ascenso o permanencia se ha concedido en Ferkauf sobre la oposición de la facultad. *Íd.,* págs. 620, 633. El Decano en Belfer testificó que no tenía derecho a pasarle por encima a las decisiones de la facultad en cuanto a permanencia y no renovaciones [*nonrenewal*].' *Íd.,* pág. 419." (Traducción y énfasis nuestros.) *NLRB v. Yeshiva University*, 444 U.S. 672 escs. 4–5 (1980).

ción Superior, revisión de diciembre de 1990 (en adelante Reg. Gen. U.P.R.), Sec. 41.3.1. Además, son éstos los encargados de nombrar al personal docente, previa consulta con el Comité de Personal. Reg. Gen. U.P.R., Sec. 41.3.4. El proceso de evaluación directa del personal docente también recae en este comité, que tiene que hacerlo de acuerdo con *las normas establecidas por la Junta Universitaria.*

Por otro lado, es la Junta Administrativa la que concede las licencias de sabáticas, Reg. Gen. U.P.R., Sec. 55.6.1; las permanencias, Reg. Gen. U.P.R., Sec. 50.1, y los ascensos, Reg. Gen. U.P.R., Sec. 51.1.1. Los Rectores y el Presidente, según sea el caso, previa consulta con los Decanos o jefes de departamentos y del profesor afectado, deciden los traslados. Reg. Gen. U.P.R., Sec. 52.1. El Presidente, previa consulta con la Junta Universitaria, formula las modificaciones al Plan de Sueldos del Personal Docente; sin embargo, la Junta de Síndicos es quien las aprueba. Reg. Gen. U.P.R., Sec. 53.1. Finalmente, los ajustes en el costo de la matrícula también son establecidos y revisados periódicamente por la Junta de Síndicos. 18 L.P.R.A. sec. 823.

Precisamente, la naturaleza gerencial de las funciones antes mencionadas explica por qué la Junta de Relaciones del Trabajo no incluyó, como parte de la unidad apropiada de negociación, a los organismos a los cuales le fueron conferidas.[6]

Se insiste en que los profesores participan en y a través del Senado Académico. No obstante, esa participación es en

---

[6] Por esa razón, correctamente la Junta de Relaciones del Trabajo excluyó de la unidad apropiada para la negociación colectiva, además del personal no docente, al verdadero cuerpo gerencial universitario, a saber, "los miembros del Consejo de Educación Superior (Junta de Síndicos), el Presidente, los miembros de la Junta Administrativa, el Rector, los Decanos y los Jefes o Directores de Departamentos, los miembros de los Comités de Personal, ... supervisores, ejecutivos, administradores, empleados confidenciales o íntimamente ligados a la gerencia; y cualesquiera otras personas con autoridad para emplear, ascender, disciplinar, despedir; o, de alguna manera variar el status de los profesores". Solicitud de revisión, pág. 36. Véase, además, Anotación, *Who are "Supervisors" within Meaning of National Labor Relation Act (29 U.S.C.S. secs. 151 et seq.) in Education and Health Services,* 52 A.L.R. Fed. 28 (1981).

*calidad representativa* de sus compañeros profesores. Reg. Gen. U.P.R., Sec. 27.4. Se limitan a participar "en los procesos institucionales cooperando y colaborando estrechamente en el establecimiento de *normas académicas* dentro del Reglamento General de la Universidad de Puerto Rico". (Énfasis suplido.) Difícilmente podemos interpretar esa facultad como *función gerencial.*

En síntesis, la U.P.R. no aportó prueba suficiente para demostrar que la participación de sus profesores, a través del Senado Académico, alcance los linderos de *NLRB v. Yeshiva University*, supra. Es ineludible concluir que no forman parte de su cuerpo gerencial.

## III

No se nos escapa el argumento mayoritario a los efectos de que reconocer a los profesores el derecho a unionarse redundaría en un conflicto de lealtades. Aducen que serían los mismos unionados quienes elegirían, entre sus miembros, quiénes ocuparían las posiciones gerenciales. *El argumento es circular; exige que completemos toda su vuelta.* A poco reflexionemos, ¿no es esa la situación bajo el esquema existente?

Actualmente son los *mismos* profesores quienes eligen a algunos de sus compañeros para ejercer funciones estrictamente de asesoramiento en el Comité de Personal y en la Junta Administrativa. *Evidentemente, en esas situaciones, el referido conflicto no emana del reconocimiento a los profesores a sindicalizarse.* De existir, su génesis es la propia ley orgánica y el reglamento, no la existencia potencial de una unión. Todo lo contrario, si acaso el dictamen de la Junta de Relaciones del Trabajo dejan fuera al Comité de Personal y a la Junta Administrativa, entre otros, logra salvar el conflicto.

Adviértase que la U.P.R. califica como "conflicto" lo que a menudo se da en el contexto de corporaciones públicas,

en las cuales los empleados asociados con la gerencia negocian con la unión, al conocer que sus beneficios desembocarán en última instancia para sí mismos y las agrupaciones gerenciales de las que forman parte. No obstante, en esos casos hemos reconocido, sin ambages, el derecho a negociar colectivamente.

*Recapitulando*, en lo esencial, la U.P.R. cumple con los criterios jurisprudenciales sobre la instrumentalidad gubernamental que funciona como empresa privada. La gran mayoría de los miembros de su facultad no desempeñan funciones intrínsecas de gobierno. No hay argumentos sólidos convincentes que justifiquen, a base del interés, orden y seguridad públicos, negar esa realidad.

Rehusamos aceptar como dogma de fe la decisión de *NLRB v. Yeshiva University*, supra, máxime cuando ésta se dio en el contexto de una interpretación de la Ley Federal de Relaciones del Trabajo, que contrario a la nuestra, carece del sostén directo constitucional.

La mayoría parece olvidar que es la *Ley de Relaciones del Trabajo de Puerto Rico*, en armonía con *nuestra Constitución*, la que implementa la negociación colectiva laboral; NO ES LA LEY FEDERAL. Parafraseando nuestro disentir en *Morales Morales v. E.L.A.*, 126 D.P.R. 92, 117 (1990) —en que la mayoría validó una reglamentación que excluía a los huelguistas de los beneficios del programa de cupones de alimentos— "hay margen pues, para *una adjudicación legítimamente autonómica*". (Énfasis en el original suprimido y énfasis suplido.)

Para los profesores universitarios, el Art. II, Sec. 17 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, ha entrado en un estado permanente de hibernación judicial.

— o —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Este Tribunal tiene *la obligación jurídica de actuar conforme a unas normas y parámetros que limitan su autoridad y facultad para expresarse respecto a un asunto en particular.* Esto es, en ocasiones estamos impedidos de expresar nuestro criterio sobre un asunto en específico, y resolver un caso, *no obstante lo convencido que puedan estar, o la opinión formada que puedan tener, sus integrantes sobre dicho asunto.*

El presente recurso es un *vivo ejemplo* de lo anteriormente expresado. No importa lo convencido que pueda estar uno, o la mayoría, de los Jueces que integran este Tribunal sobre el derecho que puedan tener —o sobre la carencia del mismo— los profesores de la Universidad de Puerto Rico a formar una unión para la negociación colectiva, *resulta totalmente improcedente en derecho que nos expresemos al efecto en estos momentos.*

Ello, *llana y sencillamente,* debido a que este Tribunal *no tiene jurisdicción para expresarse sobre dicho derecho en esta etapa de los procedimientos;* situación que, naturalmente, constituye una de las normas o parámetros *que limitan nuestra facultad para expresarnos sobre un asunto en específico en un momento determinado.* Es por ello que *ni* podemos suscribir la opinión mayoritaria del Juez Asociado Señor Fuster Berlingeri *ni* la opinión disidente del Juez Asociado Señor Negrón García *y la razón por la cual* nos unimos a la opinión disidente del Juez Asociado Señor Hernández Denton.

*La situación en éste, el más Alto Foro judicial del País, es ciertamente cada día más alarmante.* Hace escasamente algunas semanas, una mayoría de los integrantes del Tribunal —sin que existiera recurso, caso o controversia alguna ante este Foro— decretó la inconstitucionalidad,

nada más y nada menos, que de un proyecto de ley, el de la llamada "Reforma Judicial". Al así actuar hizo caso omiso de la norma jurisprudencial, *restrictiva de jurisdicción*, sobre la existencia de "caso y controversia" para poder resolver un recurso. Véase *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

Hoy, *nuevamente*, el Tribunal *impúnemente viola* otra norma jurisprudencial, *igualmente restrictiva de su jurisdicción*, establecida desde hace cuatro (4) décadas; *la cual rige no sólo en nuestra jurisdicción sino que igualmente en la jurisdicción federal, a saber*: la norma a los efectos de que las decisiones relativas al procedimiento de representación *sólo* son revisables a través de la *vía colateral* de la comisión de prácticas ilícitas de trabajo. Véanse: *Luce & Co. v. Junta Relaciones del Trabajo*, 82 D.P.R. 96 (1961); *Junta Relaciones del Trabajo v. Ortega*, 79 D.P.R. 760 (1956); *Boire v. Greyhound*, 376 U.S. 473 (1964); *American Federation of Labor v. N.L.R.B.*, 308 U.S. 401 (1940). Norma, *sabia y pensada*, que tiene el *noble propósito* de tratar de equiparar al más débil con el más fuerte. *Boire v. Greyhound*, ante.

*El papel, claro está, aguanta todo lo que se escriba sobre el mismo.* Resulta curioso como la mayoría del Tribunal —*"razonando" a su conveniencia*— llega a la conclusión de que tiene "jurisdicción" para resolver en forma negativa, *en estos momentos*, la controversia sobre si los profesores del Recinto de Río Piedras de la Universidad de Puerto Rico tienen derecho a organizarse y a negociar colectivamente. Para llegar a dicha errónea conclusión, la Mayoría *acomodaticiamente* alega que: (1) está presente una cuestión de índole constitucional, *la cual luego descarta y no resuelve*; (2) que la parte recurrente plantea una cuestión "novel e importante", *como si éste fuera el único recurso en que ello se hace*,([1]) y (3) por último, que permitir que en el presente

---

([1]) No debe perderse de vista que el hecho de que en un recurso, que se radica ante este Tribunal, se plantee una llamada cuestión "novel", o de "primera impre-

caso se dé el proceso, *común y ordinario*, de celebración de elecciones, certificación de la unión por la Junta de Relaciones del Trabajo, etc. sería "altamente perjudicial" para la Universidad de Puerto Rico, *como si los profesores del Recinto de Río Piedras fueran unos desalmados que van a destruir el referido Recinto.* Dicho proceso, *con los riesgos normales y corrientes que conlleva el mismo*, se permite en todos los demás casos. *¿Por qué no en la presente situación?* Después de todo, esos "riesgos" son parte del "precio" que se paga por disfrutar del *privilegio* de vivir en una democracia como la nuestra.

En resumen, en el día de hoy la Mayoría, repetimos, acomodaticiamente se olvida de —o, sencillamente, no le importa— *la regla básica de que para que este Tribunal pueda resolver un caso tiene que tener jurisdicción para ello.* La actuación de la Mayoría *es una sumamente peligrosa.* Aparte del hecho que actuaciones como la presente, *por lo erráticas e incomprensibles que resultan ser desde un punto de vista jurídico*, tienen el efecto de *desestabilizar el derecho* en nuestra jurisdicción, las mismas pueden servir de base en un futuro no muy lejano a un legítimo planteamiento, *proveniente de partes litigantes no tan afortunadas*, sobre "favoritismo judicial"; *situación realmente intolerable.*

— O —

Opinión disidente del Juez Asociado Señor Hernández Denton, a la cual se une el Juez Asociado Señor Rebollo López.

Por entender que por mandato de ley carecemos de autoridad para revisar la orden emitida por la Junta de Re-

---

sión", es un factor únicamente a ser considerado por el Tribunal en relación con la decisión que tiene que hacer sobre si expide, o no, el recurso; *claro está, se parte de la premisa que el Tribunal tiene jurisdicción para expedirlo.* En otras palabras, *la existencia de una cuestión "novel" no le concede, por sí sólo, jurisdicción al Tribunal sobre el recurso radicado.*

laciones del Trabajo (en adelante la Junta) y que en esta etapa de los procedimientos debemos abstenernos de pasar juicio sobre la corrección del decreto de que los profesores del Recinto de Río Piedras de la Universidad de Puerto Rico son empleados con derecho a formar una unión para la negociación colectiva, disentimos.

## I

La Ley de Relaciones del Trabajo de Puerto Rico (en adelante Ley) contiene un mandato claro y expreso que nos impide asumir jurisdicción para revisar la decisión de la Junta:

> (3) ... Las conclusiones de la Junta, el procedimiento electoral, la resolución de la controversia relativa a la representación, la determinación de la unidad y el certificado del resultado de cualquier elección así llevada a cabo, *serán finales y estarán sujetos a revisión judicial sólo de la manera que se dispone en el inciso (4) de esta sección.*
> (4) Siempre que una orden de la Junta dictada de acuerdo con [el artículo 9 de esta Ley] se base, en todo o en parte, en hechos certificados después de una investigación o audiencia pública efectuada de acuerdo con el inciso (3) [de este artículo] y exista una petición para que se ponga en vigor dicha orden y para que se revise, la certificación y el expediente de la investigación o audiencia efectuada de acuerdo con el inciso (3) [de este artículo] se incluirán en la transcripción del expediente completo que ha de presentarse de acuerdo con [el artículo 9] y entonces el decreto del tribunal, poniendo en vigor, modificando, o anulando en todo o en parte la orden de la Junta, se hará y se expedirá a base de los autos, el testimonio y los procedimientos expuestos en dicha transcripción. (Énfasis suplido.) Art. 5 de la Ley Núm. 130 de 8 de mayo de 1945 (29 L.P.R.A. sec. 66).

Por su parte, el Art. 9 de la Ley, 29 L.P.R.A. sec. 70, establece el procedimiento para que la Junta emita órdenes cuando se cometan prácticas ilícitas del trabajo. También provee para la revisión judicial de dichas órdenes o para obtener un mandato judicial y ponerlas en vigor. 29 L.P.R.A. sec. 70(2)(b).

De las disposiciones citadas surge un esquema construido deliberadamente para permitir la revisión judicial de decisiones de la Junta sobre cuestiones de representación, pero *sólo después que la Junta haya decidido si se ha incurrido o no en alguna práctica ilícita del trabajo.*

Nuestra jurisprudencia ha reconocido este principio. *Luce & Co. v. Junta Relaciones del Trabajo*, 82 D.P.R. 96, 97–99 (1961).([1]) En *Junta Relaciones del Trabajo v. Ortega*, 79 D.P.R. 760, 765 esc. 5 (1956), establecimos que "[u]na resolución de la Junta en un procedimiento de representación no es revisable" y añadimos que "[s]i el procedimiento de representación culmina en una certificación designando a una unión como el representante de los trabajadores en cuanto a negociar colectivamente, y luego al patrono se le imputa una práctica ilícita de trabajo por negarse a negociar con la unión", entonces, al revisar esta decisión se examinarían colateralmente las determinaciones previas de la Junta en el proceso de representación.

En su obra sobre derecho laboral, los Profs. Demetrio Fernández y Celina Romany analizan cuidadosamente la Ley y concluyen que las decisiones de la Junta solamente son revisables cuando se impute una práctica ilícita de trabajo:

> El referido Artículo 9 de la Ley provee el procedimiento para prácticas ilícitas de trabajo. De manera específica, el inciso 2(a) y (b) establecen el procedimiento a seguirse por el Tribunal Supremo de Puerto Rico para solicitar el cumplimiento de una decisión y orden de la junta en casos de práctica ilícita de trabajo. La alusión a dicho Artículo 9 pone de relieve el principio que también impera en la jurisdicción federal de que las decisiones del procedimiento de representación sólo son revisables a través de la vía colateral de la comisión de prácticas ilícitas de trabajo. D. Fernández y C. Romany, *Derecho laboral:*

---

([1]) En *Luce & Co. v. Junta Relaciones del Trabajo*, 82 D.P.R. 96, 98–99 (1961), expresamos que no está sujeta a revisión directa e inmediata, entre otras, "una orden para la celebración de elecciones a los fines de determinar la unidad contratante para fines de negociación".

*casos y materiales*, Río Piedras, Ed. U.P.R., 1987, págs. 362–363. Véase, también, S. Torres Peralta, *The Regulation of the Field of Labor Relations in the Commonwealth of Puerto Rico*, 18 Rev. C. Abo. P.R. 117, 162–163 (1958).

Por otra parte, en la jurisdicción federal se ha llegado a las mismas conclusiones, a pesar de que la legislación pertinente no es tan clara como la nuestra. Véanse las Secs. 9–10 de la Ley Nacional de Relaciones del Trabajo, según enmendada, 29 U.S.C. secs. 159–160.[2] Ha sido doctrina reiterada en el ámbito federal el no permitir un ataque directo en los tribunales a las órdenes de la Junta relacionadas con el proceso de representación y certificación.[3] *A.F. of L. v. Labor Board*, 308 U.S. 401, 409–412 (1940); *Boire v. Greyhound Corp.*, 376 U.S. 473, 476–482 (1964); J. Getman y B.B. Pogrebin, *Labor Relations: The Basic Processes, Law and Practice*, Nueva York, Ed. Foundation Press, 1988, págs. 34–35; R.A. Gorman, *Basic Text on Labor Law: Unionization and Collective Bargaining*, Minnesota, Ed. West Publishing Co., 1976, págs. 11, 49 y 59–65. Esta política de revisión judicial tiene el propósito de aligerar el proceso de elección de representantes por los empleados para beneficiar así a la clase trabajadora frente a los esfuerzos de los patronos para detener el proceso me-

---

[2] En la ley federal, aunque la sección 159 corresponda sustancialmente a nuestro Art. 5, aquélla no contiene la disposición de nuestra ley que, expresamente, restringe la revisión judicial de las decisiones de la Junta de Relaciones del Trabajo (en adelante la Junta) relacionadas al proceso de representación a las situaciones, en las cuales se revisen determinaciones de la Junta que sean resultado de un procedimiento de práctica ilícita del trabajo.

[3] "Congress declared that the person aggrieved by a Board representation decision is obliged to precipitate an unfair labor practice proceeding as a means of securing review in the apellate courts.

"The most common illustration of this procedure is the employer refusal to bargain with a union which has been certified after a Board-supervised election." R.A. Gorman, *Basic Text on Labor Law: Unionization and Collective Bargaining*, Minnesota, Ed. West Publishing Co., 1976, pág. 60.

diante la impugnación judicial de cada una de las determinaciones de la Junta.([4])

Sobre la justificación de esta norma jurisdiccional, el Tribunal Supremo federal se ha expresado tajantemente:

> Es obvio que este método indirecto para obtener una revisión judicial impone retrasos significativos a los intentos de impugnar la validez de órdenes de la Junta en los procedimientos de certificación. Pero es igualmente obvio que el Congreso tuvo explícitamente la intención de imponer precisamente estas demoras. ...
>
> . . . . . . . .
>
> ... La determinación del Congreso de restringir la revisión judicial en tales situaciones fue reafirmada en 1947, momento cuando las enmiendas Taft–Harley estaban bajo consideración, cuando una comisión de conferencia rechazó una enmienda propuesta por la Cámara de Representantes que le hubiera permitido a cualquier persona interesada obtener revisión judicial inmediatamente luego de una certificación; ello porque, como comentó el Senador Taft, 'tal disposición permitiría tácticas dilatorias en procedimientos de representación'. (Traducción nuestra.) *Boire v. Greyhound Corp.*, supra, págs. 477–479.

La Cámara de Representantes de Estados Unidos, en su informe sobre el proyecto de ley que luego se convertiría en la Ley Nacional de Relaciones del Trabajo, Ley Pública Núm. 74–198 de 5 de julio de 1935 (49 Stat. 449) expresó que:

> Cuando una organización obrera, a través de sus esfuerzos, ha logrado obtener una cantidad de miembros tal que merece ser

---

([4]) Como señala el Tribunal Supremo federal, el historial legislativo a estos efectos es claro; el Congreso determinó que era sabia esta política de revisión judicial:

"... both the House and Senate Reports spelled out the thesis, repeated on the floor, that the purpose of [the statute] was to provide 'for review in the courts only after the election has been held and the Board has ordered the employer to do something predicated upon the results of the election'." (Escolios omitidos.) *Boire v. Greyhound Corp.*, 376 U.S. 401, 478–479 (1964). Véase, además, *G.J. of L. v. Labor Board*, 308 U.S. 401 (1940).

En particular, se expresó en el informe del Senado que "[it is] absolutely clear that there shall be no right to court review anterior to the holding of an election". S. Rep. No. 573, 74th Cong., 1st Sess. 14 (1935).

reconocida como la representante de los empleados para la negociación colectiva y el patrono se niega a reconocerla como tal, la unión, a menos que se pueda celebrar prontamente una elección para determinar quién será el representante, corre el riesgo de perder fuerza por razón del desgaste atribuible a demoras mientras el caso se arrastra por las cortes o, en la alternativa, se verá forzada a llamar a una huelga para que se le reconozca por virtud de su propio poder económico. Este tipo de huelgas se han llevado a cabo cuando ordenes de elecciones de la Junta Nacional de Relaciones del Trabajo han sido paralizadas por las cortes mientras son revisadas judicialmente. (Traducción nuestra.) H.R. Rep. No. 972, 74th Cong., 1st Sess. 5 (1935).

Por su parte, tanto la Comisión de Educación y Trabajo del Senado de Estados Unidos como la Comisión de Trabajo del Senado de Estados Unidos, en sus informes sobre este estatuto, expresaron su insatisfacción con el estado de derecho vigente, bajo el cual se permitía la revisión judicial de las órdenes de elecciones de la Junta Nacional de Relaciones del Trabajo; ello al amparo de la entonces vigente Resolución Pública Núm. 44 de 19 de junio de 1934 (48 Stat. 1183):

Bajo la Resolución Pública 44, cualquier intento de parte del Gobierno de celebrar una elección de representantes puede ser impugnada ab initio en las cortes, aunque dicha elección es en verdad solamente una determinación preliminar de hecho. Esto significa que el Gobierno puede ser retrasado indefinidamente antes de tomar el primer paso hacia la paz industrial. Después de casi un año, ni un solo caso, en el que un patrono haya escogido impugnar una orden de elecciones de la Junta, ha sido decidido por las cortes apelativas de circuito. (Traducción nuestra.) Sen. Rep. No. 573, Committee on Education and Labor, 74th Cong., 1st Sess. 5–6 (1935).

La debilidad [del procedimiento bajo la Resolución 44] es que, bajo la disposición de revisión de órdenes de elecciones, los patronos tienen un medio de demorar las elecciones por meses si acuden a la corte apelativa de circuito. ... En estos momentos hay diez casos pendientes ante las cortes apelativas de circuito, en los que se solicita la revisión de órdenes de elecciones de la Junta. Sólo se han argumentado tres de ellos y ninguno se ha decidido. (Traducción nuestra.) H.R. No. 1147, Committee on Labor, 74th Cong., 1st Sess. 6.

El profesor Gorman, tratadista de derecho laboral norteamericano, resume la razón de ser de la norma antedicha del modo siguiente:

> El objetivo de esta maquinaria indirecta [de revisión judicial] es impedir impugnaciones dilatorias dentro de casos de representación que retrasen la celebración de una elección y la pronta consignación de las preferencias de los obreros sobre la negociación colectiva; más aún, el resultado de la elección hará académicas, en muchos casos, las impugnaciones a las decisiones de la Junta sobre representación. (Traducción nuestra.) Gorman, *op. cit.*, pág. 11.

En la jurisdicción federal se ha establecido una excepción limitada a la normativa reseñada. En *Leedom v. Kyne*, 358 U.S. 184 (1958), se decidió que procedía la revisión judicial directa, cuando la propia Junta admitió haber actuado en exceso de los poderes que se le delegaron, así como contra una disposición estatutaria clara y cuando, de otro modo, los empleados que llevaron la acción no tendrían manera de revisar la actuación de la Junta que les privó de un derecho que el estatuto explícitamente les otorgaba. Véanse: *Briscoe v. Bell*, 432 U.S. 404, 413–414 esc. 13 (1977); *Boire v. Greyhound Corp.*, supra.

## II

En este caso, la Universidad de Puerto Rico pretende revisar una determinación de la Junta para ordenar la celebración de una elección entre los profesores del Recinto de Río Piedras y determinar si deseaban estar representados por la Asociación Puertorriqueña de Profesores Universitarios (en adelante A.P.P.U.). La Universidad alega que la Junta se equivocó al determinar que los profesores del Recinto son "empleados" dentro del significado de la Ley, y que siendo ésta una cuestión de derecho podía ser revisada en esta etapa. No tiene razón.

Aplica con todo su vigor la regla general en cuanto a que no podemos revisar los decretos de la Junta en los cuales se

ordenen elecciones. El hecho de que una parte alegue que la Junta erró en la aplicación del derecho a los hechos del caso no nos confiere la jurisdicción que el estatuto nos niega.

Precisamente, en *Boire v. Greyhound Corp.*, supra, el Tribunal Supremo federal rechazó tener jurisdicción para revisar una determinación de la Junta, aun cuando el argumento del patrono consistía en una cuestión de derecho: si éste constituía un "patrono" conforme al estatuto federal. Tampoco están presentes aquí circunstancias análogas a las de *Leedom v. Kyne*, supra, debido a que éste es el típico caso previsto por el estatuto, en el cual la Universidad podrá lograr que se revise judicialmente la orden de la Junta si eventualmente se niega a negociar con la A.P.P.U. sobre el fundamento de que la Junta se equivocó en las conclusiones de derecho que la condujeron a emitir la orden de elecciones.(5)

En vista de lo expuesto anteriormente, concluimos que la orden de la Junta en el caso de marras está comprendida dentro de las que nuestra Ley impide que sean revisadas directamente por los tribunales. De ordinario, no procede la revisión judicial cuando todo lo que ha hecho la Junta es ordenar una elección conforme al Art. 5 de la Ley, *supra.* Es cuando la Junta recibe algún reclamo de práctica ilícita del trabajo, conforme al Art. 9 de la Ley, *supra*, que se activa el poder de revisión judicial de este Tribunal en cuanto a las órdenes previas de la Junta relativas al procedimiento de representación de los empleados.

Conforme a nuestro enfoque, si como resultado de las elecciones ordenadas se certificara a la A.P.P.U. como representante de los profesores y la Universidad de Puerto

---

(5) La opinión mayoritaria pretende derivar de la jurisprudencia federal una distinción entre cuestiones de hecho, que sólo se revisarían colateralmente, y cuestiones de derecho, las cuales podrían ser revisadas directamente. Esta distinción no tiene apoyo en la jurisprudencia que la propia mayoría cita, no tiene razón de ser dado el propósito que expusimos tiene la norma jurisdiccional vigente, y no tiene apoyo alguno en el texto de nuestra ley, el cual como ya señalamos es más tajante que el estatuto federal en este aspecto.

Rico se negara a negociar, ésta podría revisar la orden que la Junta pudiese emitir como resultado de un reclamo de práctica ilícita del trabajo. Esta revisión incluiría el pasar juicio colateralmente sobre la determinación de la Junta relativa a que los profesores del Recinto de Río Piedras son, como regla general, "empleados" conforme a la Ley.

Al resolver lo contrario, la opinión del Tribunal pasa por alto el texto claro de nuestra Ley, el mandato de nuestra propia jurisprudencia y la fuerza persuasiva de la doctrina en la jurisdicción federal.[6] Al concluir que en estas circunstancias tenemos autoridad para revisar las determinaciones de la Junta, la opinión del Tribunal destruye el delicado esquema que nuestra Asamblea Legislativa diseñó cuidadosamente hace casi cincuenta (50) años con el propósito de proteger a nuestra clase trabajadora de las tácticas dilatorias de patronos que se oponen a la sindicación de los obreros. Aparte de los posibles méritos que sustantivamente pueda tener la posición de la Universidad de Puerto Rico, por virtud del claro mandato de nuestra legislación, estamos obligados a abstenernos de revisar las conclusiones de la Junta.

De esta manera, mediante una interpretación restric-

---

[6] Aunque asumimos jurisdicción en *J.R.M. v. J.R.T.*, 108 D.P.R. 448 (1979), para revisar una orden de elecciones de la Junta, también es cierto que allí no mencionamos ni discutimos el aspecto jurisdiccional de la controversia. En la medida en que se entienda que dicho caso apoya la práctica de asumir jurisdicción en contravención al mandato estatutario, éste debería considerarse revocado.

Por otro lado, en *Pérez Maldonado v. J.R.T.*, 132 D.P.R. 972 (1993), al tomar en consideración que la Ley no tomaba en cuenta el tipo de orden emitida por la Junta y que los peticionarios se amparaban en una reclamación de derechos constitucionales y no tenían otro modo de revisar el error procesal cometido por la Junta, resolvimos que procedía revisar directamente la orden de la Junta, no siendo de aplicación en esas circunstancias la regla general allí reconocida de que:

"...para obtener revisión judicial de una decisión de la Junta federal dimanante del procedimiento de representación, es necesario que la parte afectada adversamente cometa una presunta práctica ilícita de trabajo para entonces poder revisar judicialmente la decisión de la Junta, a través de la vía colateral, al dilucidarse judicialmente la comisión de la práctica ilícita." *Pérez Maldonado v. J.R.T.*, supra, pág. 980.

*Pérez Maldonado v. J.R.T.*, supra, no aplica a la situación ante nos, debido a que aquí no está presente ninguna de las circunstancias especiales que en aquel caso encontramos determinantes.

tiva y conservadora de nuestra legislación obrera y de los poderes otorgados por la Asamblea Legislativa a la Junta, se establece una excepción cuestionable a la normativa vigente de revisión judicial de las decisiones de la Junta. Disentimos.